[930 NE2d 184, 904 NYS2d 263]

Debra H., Appellant, v Janice R., Respondent.

Argued February 17, 2010; decided May 4, 2010

**POINTS OF COUNSEL**

*Lambda Legal Defense and Education Fund, Inc.*, New York City (*Susan L. Sommer* and *Jeremy R. Sanders* of counsel), and *Cohen Hennessey Bienstock & Rabin P.C.* (*Bonnie E. Rabin* and *Orrit Hershkovitz* of counsel), for Debra H., appellant. I. The courts should exercise their common-law, equitable powers to recognize the standing of a nonbiological, nonadoptive parent to preserve an ongoing parent-child relationship in the child's paramount best interests. (*Matter of Alison D. v Virginia M.*, 77 NY2d 651; *Perry-Rogers v Fasano*, 276 AD2d 67; *Matter of Jacob*, 86 NY2d 651; *Levin v Yeshiva Univ.*, 96 NY2d 484; *Lawrence v Texas*, 539 US 558; *Bowers v Hardwick*, 478 US 186; *Lewis v New York State Dept. of Civ. Serv.*, 60 AD3d 216, 12 NY3d 705; *Martinez v County of Monroe*, 50 AD3d 189; *Matter of Donna S.*, 23 Misc 3d 338; *Matter of E.S. v P.D.*, 8 NY3d 150.) II. Appellant is further entitled to assert parentage based on M.R.'s conception using an anonymous donor and resulting birth to partners in a civil union. (*Matter of Michael*, 166 Misc 2d 973; *Laura WW. v Peter WW.*, 51 AD3d 211; *Matter of Greene County Dept. of Social Servs. v Ward*, 8 NY3d 1007; *Matter of Bickford v Bickford*, 55 AD2d 719; *Matter of Karin T. v Michael T.*, 127 Misc 2d 14; *Anonymous v Anonymous*, 41 Misc 2d 886; *Matter of H.M. v E.T.*, 65 AD3d 119; *State of New York ex rel. H. v P.*, 90 AD2d 434; *Beth R. v Donna M.*, 19 Misc 3d 724; *Strnad v Strnad*, 190 Misc 786.) III. If *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) is construed to bar Debra H.'s standing to pursue her petition in the best interests of M.R., that decision should be overruled. (*Anonymous v Anonymous*, 20 AD3d 333; *Matter of Multari v Sorrell*, 287 AD2d 764; *Matter of C.M. v C.H.*, 6 Misc 3d 361; *Jean Maby H. v Joseph H.*, 246 AD2d 282; *Matter of Shondel J. v Mark D.*, 7 NY3d 320; *Beth R. v Donna M.*, 19 Misc 3d 724; *Matter of Christopher S. v Ann Marie S.*, 173 Misc 2d 824; *People v Bing*, 76 NY2d 331; *People v Hobson*,

39 NY2d 479; *Silver v Great Am. Ins. Co.*, 29 NY2d 356.) IV. The facts alleged here warrant application of the extraordinary circumstances doctrine to grant Debra H.'s petition for custody, visitation and obligations of support. (*Matter of Bennett v Jeffreys*, 40 NY2d 543; *Matter of Ronald FF. v Cindy GG.*, 70 NY2d 141; *Tait v Tait*, 44 AD3d 1142; *Matter of Canabush v Wancewicz*, 193 AD2d 260; *Matter of Boyles v Boyles*, 95 AD2d 95; *Matter of Gilbert A. v Laura A.*, 261 AD2d 886; *Matter of Christopher S. v Ann Marie S.*, 173 Misc 2d 824; *Matter of Lynda A.H. v Diane T.O.*, 243 AD2d 24.) V. The New York and US Constitutions are violated if the rights of Debra H. and M.R. to maintain their parent-child relationship go unenforced. (*Planned Parenthood of Central Mo. v Danforth*, 428 US 52; *Smith v Organization of Foster Families For Equality & Reform*, 431 US 816; *Lehr v Robertson*, 463 US 248; *Michael H. v Gerald D.*, 491 US 110; *Prince v Massachusetts*, 321 US 158; *Troxel v Granville*, 530 US 57; *Matter of E.S. v P.D.*, 8 NY3d 150; *Gomez v Perez*, 409 US 535; *Weber v Aetna Casualty & Surety Co.*, 406 US 164; *Levy v Louisiana*, 391 US 68.)

*Fried, Frank, Harris, Shriver & Jacobson LLP,* New York City (*Jennifer L. Colyer, Adam B. Gottlieb* and *Scott Thompson* of counsel), and *Parisi & Associates* (*Anthony Parisi III* of counsel), for M.R., appellant. I. The facts here strongly support a hearing to determine whether Janice R. should be estopped from now denying Debra H.'s standing to seek custody and visitation. (*Finlay v Finlay*, 240 NY 429; *Matter of Alison D. v Virginia M.*, 77 NY2d 651; *Matter of Shondel J. v Mark D.*, 7 NY3d 320; *Jean Maby H. v Joseph H.*, 246 AD2d 282; *Matter of Sharon GG. v Duane HH.*, 63 NY2d 859; *Langan v St. Vincent's Hosp. of N.Y.*, 196 Misc 2d 440, 25 AD3d 90, 6 NY3d 890; *Matter of Baby Boy C.*, 84 NY2d 91; *Beth R. v Donna M.*, 19 Misc 3d 724; *Matter of Charles v Charles*, 296 AD2d 547; *Matter of Janis C. v Christine T.*, 294 AD2d 496.) II. In the alternative, the Court should overrule *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) and *Matter of Ronald FF. v Cindy GG.* (70 NY2d 141 [1987]). (*Anonymous v Anonymous*, 20 AD3d 333; *Matter of Multari v Sorrell*, 287 AD2d 764; *Matter of C.M. v C.H.*, 6 Misc 3d 361; *Gallagher v St. Raymond's R. C. Church*, 21 NY2d 554; *Caceci v Di Canio Constr. Corp.*, 72 NY2d 52; *Silver v Great Am. Ins. Co.*, 29 NY2d 356; *Gelbman v Gelbman*, 23 NY2d 434; *People v Hobson*, 39 NY2d 479; *People v Epton*, 19 NY2d 496; *Matter of Bennett v Jeffreys*, 40 NY2d 543.) III. The United States and New York constitutional guarantees of due process and equal protection mandate a hearing to determine whether visitation is in M.R.'s

best interests. (*Young v Young,* 212 AD2d 114; *Planned Parenthood of Central Mo. v Danforth,* 428 US 52; *Smith v Organization of Foster Families For Equality & Reform,* 431 US 816; *Cleveland Bd. of Ed. v LaFleur,* 414 US 632; *Lehr v Robertson,* 463 US 248; *Michael H. v Gerald D.,* 491 US 110; *Troxel v Granville,* 530 US 57; *Weber v Aetna Casualty & Surety Co.,* 406 US 164; *Matter of Burns v Miller Constr.,* 55 NY2d 501; *Gomez v Perez,* 409 US 535.)

*Reiss Eisenpress LLP,* New York City (*Sherri L. Eisenpress, Matthew Sheppe* and *Audrey E. Weinberger* of counsel), for respondent. I. The First Department's unanimous decision correctly held that Debra H. does not have standing. (*Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Anonymous v Anonymous,* 20 AD3d 333; *Perry-Rogers v Fasano,* 276 AD2d 67, 96 NY2d 712; *Matter of Burgess v Ash,* 41 AD3d 473; *Bank v White,* 40 AD3d 790, 9 NY3d 1002; *Matter of Behrens v Rimland,* 32 AD3d 929, 8 NY3d 807; *Gulbin v Moss-Gulbin,* 45 AD3d 1230; *Matter of Multari v Sorrell,* 287 AD2d 764; *Matter of Lynda A.H. v Diane T.O.,* 243 AD2d 24, 92 NY2d 811.) II. Standing is a preliminary hurdle Debra H. cannot meet. (*Caprer v Nussbaum,* 36 AD3d 176; *New York State Assn. of Nurse Anesthetists v Novello,* 2 NY3d 207; *Matter of Dairylea Coop. v Walkley,* 38 NY2d 6; *Matter of Lynda A.H. v Diane T.O.,* 243 AD2d 24; *Godfrey v Spano,* 13 NY3d 358; *Hernandez v Robles,* 7 NY3d 338; *Gallagher v St. Raymond's R. C. Church,* 21 NY2d 554; *Caceci v Di Canio Constr. Corp.,* 72 NY2d 52; *Gelbman v Gelbman,* 23 NY2d 434; *Silver v Great Am. Ins. Co.,* 29 NY2d 356.) III. Equitable estoppel is not available to establish standing in custody and visitation proceedings. (*Matter of Shondel J. v Mark D.,* 7 NY3d 320; *Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Jean Maby H. v Joseph H.,* 246 AD2d 282; *Matter of Sharon GG. v Duane HH.,* 63 NY2d 859; *People v Carvajal,* 6 NY3d 305; *Nussenzweig v diCorcia,* 38 AD3d 339; *Lichtman v Grossbard,* 73 NY2d 792; *People v Hobson,* 39 NY2d 479; *People v Robles,* 27 NY2d 155.) IV. The standing requirements under Domestic Relations Law § 70 do not violate the Due Process Clause or Equal Protection Clause of either the United States or New York Constitution. (*Troxel v Granville,* 530 US 57; *Santosky v Kramer,* 455 US 745; *Stanley v Illinois,* 405 US 645; *Meyer v Nebraska,* 262 US 390; *Pierce v Society of Sisters,* 268 US 510; *M. L. B. v S. L. J.,* 519 US 102; *Prince v Massachusetts,* 321 US 158, 804; *Matter of Jacob,* 86 NY2d 651; *Lehr v Robertson,* 463 US 248; *Michael H. v Gerald D.,* 491 US

110.) V. There is no competent evidence in the record that M.R. would be any more harmed by the discontinuance of a relationship with Debra H. than he would be by the discontinuance of his relationship with his uncle or his nanny. (*Matter of Alison D. v Virginia M.*, 77 NY2d 651; *Troxel v Granville*, 530 US 57.) VI. Even if equitable estoppel does apply to custody and visitation proceedings, it should only apply prospectively, not retroactively. (*Matter of Ronald FF. v Cindy GG.*, 70 NY2d 141; *Matter of Alison D. v Virginia M.*, 77 NY2d 651; *Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577; *Anonymous v Anonymous*, 6 NY3d 740; *Gurnee v Aetna Life & Cas. Co.*, 55 NY2d 184; *Chevron Oil Co. v Huson*, 404 US 97.) VII. Appellant gratuitously attacks Janice R. and misrepresents the record and Supreme Court holding. (*Langan v St. Vincent's Hosp. of N.Y.*, 196 Misc 2d 440; *Matter of Ronald FF. v Cindy GG.*, 70 NY2d 141; *Matter of Alison D. v Virginia M.*, 77 NY2d 651; *Anonymous v Anonymous*, 6 NY3d 740.)

*Kramer Levin Naftalis & Frankel LLP*, New York City (*Eve Preminger* and *Jason Moff* of counsel), for National Association of Social Workers and others, amici curiae. I. Attachment bonds between children and their gay and lesbian psychological parents should be protected and preserved in the children's best interests. (*Matter of Tropea v Tropea*, 87 NY2d 727; *Matter of Bennett v Jeffreys*, 40 NY2d 543.) II. Sibling bonds between children should be protected and preserved in the children's best interests, including bonds between older and younger siblings.

*Suzanne B. Goldberg*, New York City, for Richard Allan and others, amici curiae. I. Family law academics overwhelmingly endorse a functional approach to recognizing the legal family. (*Matter of Alison D. v Virginia M.*, 77 NY2d 651.) II. Adoption of a functional approach to recognizing parent-child relationships in jurisdictions across the country, including New York, confirms the approach's viability and simplicity. (*Matter of Alison D. v Virginia M.*, 77 NY2d 651; *People v Damiano*, 87 NY2d 477; *People v Hobson*, 39 NY2d 479; *People v Taylor*, 9 NY3d 129; *People v Bing*, 76 NY2d 331; *Burnet v Coronado Oil & Gas Co.*, 285 US 393; *Matter of Simonson v Cahn*, 27 NY2d 1; *Bing v Thunig*, 2 NY2d 656; *People v Bartolomeo*, 53 NY2d 225; *Babcock v Jackson*, 12 NY2d 473).

*Debevoise & Plimpton LLP*, New York City (*Maeve O'Connor* and *Patrice Sabach* of counsel), and *Skadden, Arps, Slate, Meagher & Flom LLP* (*Vaughn Williams, Sean Marlaire* and

*Katrina James* of counsel), for Citizens' Committee for Children and others, amici curiae. I. Granting standing to de facto parents is in the best interests of M.R. and children similarly situated. II. The Court should use its equitable power to protect the best interests of children such as M.R. (*Matter of Rich v Kaminsky,* 254 App Div 6; *Laura WW. v Peter WW.,* 51 AD3d 211; *Matter of Shondel J. v Mark D.,* 7 NY3d 320; *Matter of Baby Boy C.,* 84 NY2d 91; *Matter of Bruce W.L. v Carol A.P.,* 46 AD3d 1471; *Matter of Sarah S. v James T.,* 299 AD2d 785; *Matter of Karin T. v Michael T.,* 127 Misc 2d 14; *Matter of Glenn T. v Donna U.,* 226 AD2d 803; *Matter of Ettore I. v Angela D.,* 127 AD2d 6; *Matter of Kristen D. v Stephen D.,* 280 AD2d 717.) III. This Court is capable of fashioning a test that appropriately protects and balances the rights of the biological or adoptive parent, the de facto parent, and the child. (*Matter of E.S. v P.D.,* 8 NY3d 150; *Weiss v Weiss,* 52 NY2d 170.) IV. The availability of second parent adoption does not adequately protect children such as M.R. (*Jean Maby H. v Joseph H.,* 246 AD2d 282.) V. This Court should not wait for the New York Legislature to protect M.R. and children similarly situated. (*Anonymous v Anonymous,* 20 AD3d 333; *Matter of Multari v Sorrell,* 287 AD2d 764; *United States v Mauro,* 436 US 340; *Flanagan v Mount Eden Gen. Hosp.,* 24 NY2d 427; *Matter of New York Pub. Interest Research Group v New York State Dept. of Ins.,* 66 NY2d 444; *Davis v United States,* 569 F Supp 2d 91.)

*Michael Getnick,* Albany, and *Paul, Weiss, Rifkind, Wharton & Garrison LLP,* New York City (*Roberta A. Kaplan, Michael N. Berger* and *Julie E. Fink* of counsel), for New York State Bar Association, amicus curiae. I. The Court is not constrained to follow past precedent that is manifestly unjust and unsound. (*Silver v Great Am. Ins. Co.,* 29 NY2d 356; *Woods v Lancet,* 303 NY 349; *Bing v Thunig,* 2 NY2d 656; *People v Hobson,* 39 NY2d 479; *People v Bing,* 76 NY2d 331; *People v Epton,* 19 NY2d 496; *Gallagher v St. Raymond's R. C. Church,* 21 NY2d 554; *Caceci v Di Canio Constr. Corp.,* 72 NY2d 52; *Buckley v City of New York,* 56 NY2d 300; *Gelbman v Gelbman,* 23 NY2d 434.) II. *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) is inconsistent with New York cases recognizing out-of-state same-sex marriage. (*Laura WW. v Peter WW.,* 51 AD3d 211; *Matter of Gordon,* 131 Misc 2d 823; *State of New York ex rel. H. v P.,* 90 AD2d 434; *Matter of Sebastian,* 25 Misc 3d 567; *Matter of May,* 305 NY 486; *Matter of Jacob,* 86 NY2d 651.) III. *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) is outmoded and should be overturned. (*Matter of Jacob,* 86 NY2d 651; *Matter of Tripp v*

*Hinckley,* 290 AD2d 767; *Matter of Leora F. v Sofia D.,* 167 Misc 2d 840; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *Anonymous v Anonymous,* 20 AD3d 333; *Matter of Multari v Sorrell,* 287 AD2d 764; *Matter of C.M. v C.H.,* 6 Misc 3d 361; *Broadnax v Gonzalez,* 2 NY3d 148; *Millington v Southeastern El. Co.,* 22 NY2d 498; *Matter of Sebastian,* 25 Misc 3d 567.) IV. *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) is inconsistent with this Court's more recent decision in *Matter of Shondel J. v Mark D.* (7 NY3d 320 [2006]). (*Matter of Jose F.R. v Reina C.A.,* 46 AD3d 564; *Matter of Louise P. v Thomas R.,* 223 AD2d 592; *Anonymous v Anonymous,* 20 AD3d 333; *Matter of Janis C. v Christine T.,* 294 AD2d 496; *Matter of Cindy P. v Danny P.,* 206 AD2d 615; *Jean Maby H. v Joseph H.,* 246 AD2d 282; *Matter of Christopher S. v Ann Marie S.,* 173 Misc 2d 824; *Matter of Gilbert A. v Laura A.,* 261 AD2d 886; *Beth R. v Donna M.,* 19 Misc 3d 724; *Bing v Thunig,* 2 NY2d 656.)

*Hogan & Hartson LLP,* New York City (*Allen A. Drexel, Hoa T.T. Hoang, Katie M. Lachter, Dennis M. Quinio, Brian G. Strand* and *Samuel E. Wolfe* of counsel), *Cynthia L. Schrock Seeley, Ann B. Lesk, Allan E. Mayefsky, Dakota D. Ramseur, Roberto Ramirez* and *Jonathan B. Behrins,* Staten Island, for New York City Bar Association and others, amici curiae. I. *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) has been superseded by *Matter of Shondel J. v Mark D.* (7 NY3d 320 [2006]) and should now be reconsidered in the interests of consistency and basic fairness. (*Matter of Jacob,* 86 NY2d 651; *Matter of H.M. v E.T.,* 65 AD3d 119; *People v Liberta,* 64 NY2d 152; *Mississippi Univ. for Women v Hogan,* 458 US 718; *Craig v Boren,* 429 US 190; *United States v Virginia,* 518 US 515; *Brown v State of New York,* 89 NY2d 172; *Hernandez v Robles,* 7 NY3d 338; *Town of Orangetown v Magee,* 88 NY2d 41; *Jean Maby H. v Joseph H.,* 246 AD2d 282.) II. Consistent with New York's child-centered public policy and the historical applications of equitable estoppel doctrine, standing should be conferred evenhandedly to de facto parents in custody and visitation proceedings. (*Matter of Shondel J. v Mark D.,* 7 NY3d 320; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Matter of Janis C. v Christine T.,* 294 AD2d 496; *Matter of C.M. v C.H.,* 6 Misc 3d 361; *Anonymous v Anonymous,* 20 AD3d 333; *Guinan v Guinan,* 102 AD2d 963; *Syracuse Orthopedic Specialists, P.C. v Hootnick,* 42 AD3d 890; *Matter of Huntington TV Cable Corp. v State of N.Y. Commn. on Cable Tel.,* 94 AD2d 816, 61 NY2d 926; *Empire Fin. Servs., Inc. v Bellantoni,* 53 AD3d 1095; *Matter of Reynolds v Oster,* 192 AD2d 794.) III. *Matter of Alison D. v Virginia M.* (77

NY2d 651 [1991]) is outmoded, and strict application of the decision ignores the needs and rights of many New York families. (*Martinez v County of Monroe,* 50 AD3d 189; *Beth R. v Donna M.,* 19 Misc 3d 724; *Matter of C.M. v C.H.,* 6 Misc 3d 361; *Anonymous v Anonymous,* 20 AD3d 333; *Matter of Multari v Sorrell,* 287 AD2d 764; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *Matter of Jacob,* 86 NY2d 651; *Matter of Behrens v Rimland,* 32 AD3d 929; *Matter of Janis C. v Christine T.,* 294 AD2d 496; *Matter of Speed v Robins,* 288 AD2d 479.)

*New York Civil Liberties Union Foundation,* New York City (*Matthew Faiella, Galen Sherwin* and *Arthur Eisenberg* of counsel), and *American Civil Liberties Union Foundation* (*Rose Saxe* of counsel), for New York Civil Liberties Union and others, amici curiae. I. The constitutional protection of parent-child relationships is not limited to biological or formally recognized legal parents. (*Prince v Massachusetts,* 321 US 158; *Moore v East Cleveland,* 431 US 494; *Smith v Organization of Foster Families For Equality & Reform,* 431 US 816; *Lehr v Robertson,* 463 US 248; *Quilloin v Walcott,* 434 US 246; *Stanley v Illinois,* 405 US 645; *Cleveland Bd. of Ed. v LaFleur,* 414 US 632; *Vlandis v Kline,* 412 US 441; *Matter of E.S. v P.D.,* 8 NY3d 150; *Troxel v Granville,* 530 US 57.) II. Applying equitable principles to grant standing to de facto parents and protect the best interests of the child is consistent with the broad equitable powers of New York courts, decisions by other state high courts and the US Constitution. (*Matter of Steinway,* 159 NY 250; *Kaminsky v Kahn,* 23 AD2d 231; *People ex rel. Riesner v New York Nursery & Child's Hosp.,* 230 NY 119; *Matter of Burde,* 7 AD2d 344; *Finlay v Finlay,* 240 NY 429; *Matter of Sandfort v Sandfort,* 278 App Div 331; *Matter of Shondel J. v Mark D.,* 7 NY3d 320; *Jean Maby H. v Joseph H.,* 246 AD2d 282; *Matter of Diana E. v Angel M.,* 20 AD3d 370; *Matter of Alison D. v Virginia M.,* 77 NY2d 651.)

*Wilson Sonsini Goodrich & Rosati,* New York City (*Marina Tsatalis, Elizabeth Tippett* and *Joy Chia* of counsel), for National Center for Lesbian Rights and others, amici curiae. I. Numerous states have recognized that a non-legal parent may seek custody or visitation where there is a parent-child relationship that was fostered by the legal parent. II. The presumption of parentage for children born through donor insemination must apply to unmarried couples as well as married couples. (*Laura WW. v Peter WW.,* 51 AD3d 211; *State of New York ex rel. H. v P.,* 90 AD2d 434; *K.B. v J.R.,* 26 Misc 3d 465; *Matter of Sebastian,*

25 Misc 3d 567; *Matter of Karin T. v Michael T.,* 127 Misc 2d 14; *Matter of Jacob,* 86 NY2d 651; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *Matter of Donna S.,* 23 Misc 3d 338; *Beth R. v Donna M.,* 19 Misc 3d 724; *Martinez v County of Monroe,* 50 AD3d 189.)

*Alliance Defense Fund,* Scottsdale, Arizona (*Brian W. Raum* of counsel), and *Ruta & Soulios, LLP,* New York City (*Joseph A. Ruta* of counsel), for New Yorkers for Constitutional Freedoms, Ltd., amicus curiae. I. The U.S. Supreme Court developed the recognition of fundamental parental rights. (*Meyer v Nebraska,* 262 US 390; *People v Hollman,* 68 NY2d 202; *Bartels v Iowa,* 262 US 404; *Matter of Efrain C.,* 63 Misc 2d 1019; *Farrington v Tokushige,* 273 US 284; *Matter of Daniel A.D.,* 106 Misc 2d 370; *Prince v Massachusetts,* 321 US 158; *People ex rel. Sibley v Sheppard,* 54 NY2d 320; *Wisconsin v Yoder,* 406 US 205; *Quilloin v Walcott,* 434 US 246.) II. Judicially implementing de facto parenting or parenthood by estoppel would infringe upon the well-established fundamental rights of fit natural parents. (*Troxel v Granville,* 530 US 57; *Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Stanley v Illinois,* 405 US 645; *Hodgson v Minnesota,* 497 US 417; *Santosky v Kramer,* 455 US 745; *Lehr v Robertson,* 463 US 248; *Lassiter v Department of Social Servs. of Durham Cty.,* 452 US 18; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141.) III. Because this Court's case law concerning de facto parenting or parenthood by estoppel is consistent with controlling U.S. Supreme Court precedent, this Court should not overturn that case law. (*Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Stanley v Illinois,* 405 US 645; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Troxel v Granville,* 530 US 57; *Matter of Midland Ins. Co.,* 20 Misc 3d 488; *Matter of Higby v Mahoney,* 48 NY2d 15.)

*Alan J. Pierce,* Syracuse, for Single Mothers by Choice and others, amici curiae. I. *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) should not be overruled; therefore, the Court correctly held that under Domestic Relations Law § 70, an individual who is not the biological or adoptive parent of the child of another individual with whom he or she has a relationship lacks standing to seek visitation and/or custody of the child. (*Anonymous v Anonymous,* 20 AD3d 333, 6 NY3d 740; *Perry-Rogers v Fasano,* 276 AD2d 67, 96 NY2d 712; *Bank v White,* 40 AD3d 790, 9 NY3d 1002; *Matter of Behrens v Rimland,* 32 AD3d 929, 8 NY3d 807; *Matter of Multari v Sorrell,* 287 AD2d 764;

*Matter of Lynda A.H. v Diane T.O.,* 243 AD2d 24, 92 NY2d 811; *Matter of Jacob,* 86 NY2d 651; *Matter of Carolyn B.,* 6 AD3d 67; *Troxel v Granville,* 530 US 57; *Matter of Cindy P. v Danny P.,* 206 AD2d 615.) II. Equitable estoppel is not available to establish standing to seek custody or visitation under Domestic Relations Law § 70. (*Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Matter of Multari v Sorrell,* 287 AD2d 764; *Anonymous v Anonymous,* 20 AD3d 333; *Matter of Shondel J. v Mark D.,* 7 NY3d 320; *Jean Maby H. v Joseph H.,* 246 AD2d 282; *Matter of Jennifer Diane D. v Arnold D.,* 187 AD2d 425, 81 NY2d 705; *Hernandez v Robles,* 7 NY3d 338; *Godfrey v Spano,* 13 NY3d 358.)

*Law Offices of Robert W. Dapelo, P.C.,* Patchogue (*Robert W. Dapelo* of counsel), and *Marriage Law Foundation,* Lehi, Utah (*William C. Duncan* of counsel), for Family Watch International, amicus curiae. I. This Court should continue to defer to the Legislature on the fundamental question of standing to seek child custody. (*Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Debra H. v Janice R.,* 61 AD3d 460.) II. The Legislature's failure to grant standing to seek visitation and custody to unrelated adults protects the interests of children and parents. (*Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Hernandez v Robles,* 7 NY3d 338; *Matter of Jacob,* 86 NY2d 651; *Meyer v Nebraska,* 262 US 390; *Pierce v Society of Sisters,* 268 US 510; *Troxel v Granville,* 530 US 57.)

**OPINION OF THE COURT**

READ, J.

Respondent Janice R. is the biological mother of M.R., a six-year-old boy conceived through artificial insemination and born in December 2003. Janice R. and petitioner Debra H. met in 2002 and entered into a civil union in the State of Vermont in November 2003, the month before M.R.'s birth. Janice R. repeatedly rebuffed Debra H.'s requests to become M.R.'s second parent by means of adoption.

After the relationship between Janice R. and Debra H. soured and they separated in the spring of 2006, Janice R. allowed Debra H. to have supervised visits with M.R. each week on Sunday, Wednesday and Friday for specified periods of time, as well as daily contact by telephone. In the spring of 2008, however, Janice R. began scaling back the visits. By early May 2008, she had cut off all communication between Debra H. and M.R.

In mid-May 2008, Debra H. brought this proceeding against Janice R. in Supreme Court by order to show cause. She sought

joint legal and physical custody of M.R., restoration of access and decisionmaking authority with respect to his upbringing, and appointment of an attorney for the child.[1] After a hearing on May 21, 2008, the judge signed the order to show cause, which set a briefing schedule, and the parties, at his instance, entered into a "so-ordered" stipulation that reinstated the three-day-a-week visitation schedule previously followed. The stipulation required M.R.'s nanny or a mutually agreed-upon third party to accompany M.R. when he visited Debra H.

As Supreme Court later put it, "few facts . . . [were] undisputed" at the hearings and in the parties' submissions, which "differ[ed] substantially with respect to the nature and extent of [Debra H.'s] relationship with [Janice R.] and, more significantly, with M.R." (NYLJ, Oct. 9, 2008, at 26, col 1, 2008 NY Misc LEXIS 6367, *1, 5 [Sup Ct, NY County 2008]). At the hearing on July 10, 2008, Debra H. acknowledged our decision in *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]), which held that only a child's biological or adoptive parent has standing to seek visitation against the wishes of a fit custodial parent, but contended that *Matter of Shondel J. v Mark D.* (7 NY3d 320 [2006]) endorsed a nonbiological or nonadoptive parent's right to invoke equitable estoppel to secure visitation or custody notwithstanding *Alison D.* In support of this interpretation of our precedents, Debra H. emphasized that *Shondel J.* cited *Jean Maby H. v Joseph H.* (246 AD2d 282 [2d Dept 1998]), a divorce proceeding in which the husband successfully invoked equitable estoppel to seek custody and visitation with a child born to the wife prior to the marriage, whom he neither fathered nor adopted. Debra H. also urged Supreme Court to consider the effect of the parties' civil union, and alluded to the Vermont Supreme Court's decision in *Miller-Jenkins v Miller-Jenkins* (180 Vt 441, 912 A2d 951 [2006], *cert denied* 550 US 918 [2007]).

In opposition to Debra H.'s application, Janice R. stressed that she had always spurned Debra H.'s entreaties to permit a second-parent adoption. She argued that *Alison D.*, which interpreted Domestic Relations Law § 70, was not eroded or overruled by *Shondel J.*, a case involving a filiation determination; pointed out that the Legislature did not amend section 70 after *Alison D.* was handed down, or elsewhere enact any

---

**1.** After Janice R. and Debra H. broke up, Janice R. conceived another child through artificial insemination. Debra H. does not claim to have developed any relationship with this child, who was born after she brought this action.

provision broadening standing to seek visitation or custody; and observed that Janice R. conceived M.R. prior to entering into the civil union with Debra H. in Vermont. At the hearing's conclusion, Supreme Court reserved decision and continued visitation in a further "so-ordered" stipulation.

In a decision and order filed on October 9, 2008, Supreme Court ruled in Debra H.'s favor. The judge reasoned that "it [was] inconsistent to estop a nonbiological father from disclaiming paternity in order to avoid support obligations, but preclude a nonbiological parent from invoking [equitable estoppel] against the biological parent in order to maintain an established relationship with the child" since, in either event, "the court's primary concern should be furthering the best interests of the child" (2008 NY Misc LEXIS 6367, *25).

Supreme Court concluded that the facts alleged by Debra H., if true, "establish[ed] a prima facie basis for invoking the doctrine of equitable estoppel" (id. at *25-26). In this regard, the judge considered the parties' civil union to be "a significant, though not necessarily a determinative, factor in [Debra H.'s] estoppel argument" because, under Vermont law, "parties to a civil union are given the same benefits, protections and responsibilities . . . as are granted to those in a marriage," which "includes the assumption that the birth of a child during a couple's legal union is 'extremely persuasive evidence of joint parentage'" (id. at *26, quoting Miller-Jenkins, 180 Vt at 466, 912 A2d at 971).

Because of the many contested facts, however, Supreme Court ordered another hearing to resolve whether Debra H. stood in loco parentis to M.R., as she asserted, and therefore possessed standing to seek visitation and custody. The judge noted that, in the event Debra H. succeeded in proving the facts that she alleged, a further hearing would then be required to assess whether it was in M.R.'s best interest to award Debra H. visitation and/or custodial rights. Supreme Court continued the existing "so-ordered" stipulation permitting supervised visitation, and also granted Debra H.'s request for appointment of an attorney to represent the child.

Janice R. appealed, and obtained a stay of the equitable-estoppel hearing ordered by Supreme Court, pending disposition of the appeal. On April 9, 2009, the Appellate Division unanimously reversed on the law, vacated Supreme Court's order, denied the petition, and dismissed the proceeding. The court

acknowledged that while the "record indicate[d] that [Debra H.] served as a loving and caring parental figure during the first 2½ years of [M.R.'s] life, she never legally adopted [him]" and, in accordance with *Alison D.*, "a party who is neither the biological nor the adoptive parent of a child lacks standing to seek custody or visitation rights under Domestic Relations Law § 70" (61 AD3d 460, 461 [1st Dept 2009]). The Appellate Division commented that, to the extent that denial of any right to equitable estoppel in this case might be considered inconsistent with *Shondel J.* and *Jean Maby H.*, its own "reading of precedent [was] such that the doctrine of equitable estoppel may not be invoked where a party lacks standing to assert at least a right to visitation" (*id.*).

Both Debra H. and the attorney for the child asked the Appellate Division for a stay of enforcement so as to allow visitation to continue until further appellate proceedings were completed, and for leave to appeal to us. Pending resolution of those motions, a Justice of the Appellate Division granted Debra H.'s emergency application for an interim stay and allowed Sunday visitation. After the Appellate Division denied the motions on June 25, 2009 (2009 NY Slip Op 76701[U]), Debra H. and the attorney for the child separately asked us for leave to appeal and sought another stay.

■ On July 13, 2009, a Judge of this Court signed a "so-ordered" stipulation continuing one-day-a-week visitation. And on September 1, 2009, we granted Debra H. and the attorney for the child permission to appeal (13 NY3d 702 [2009]). We also approved their request for a further stay to the extent of reinstating and permitting enforcement of so much of Supreme Court's order as allowed Debra H. to have Sunday visitation with M.R. (13 NY3d 753 [2009]). We now reaffirm our holding in *Alison D.*, but reverse the Appellate Division's order in this case for reasons of comity in light of Debra H.'s status as M.R.'s parent under Vermont law.

I.

Domestic Relations Law § 70 (a) provides that

"[w]here a minor child is residing within this state, *either parent* may apply to the supreme court for a writ of habeas corpus to have such minor child brought before such court; and on the return thereof, the court, on due consideration, may award

the natural guardianship, charge and custody of such child to either parent for such time, under such regulations and restrictions, and with such provisions and directions, as the case may require, and may at any time thereafter vacate or modify such order. In all cases there shall be no prima facie right to the custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will promote its welfare and happiness, and make award accordingly" (emphasis added).

In *Alison D.*, we decided that section 70 does not confer standing on a biological stranger to seek visitation with a child in the custody of a fit parent. Debra H. urges us to exercise what she characterizes as long-standing common-law and equitable powers to recognize the parentage of a nonbiological, nonadoptive individual on a theory of equitable estoppel and in the child's best interest. As a consequence, she asks us to revisit and either distinguish or overrule *Alison D.*, a case that closely resembles this one factually.

Alison D., the former romantic partner of Virginia M., petitioned for visitation with Virginia M.'s child under Domestic Relations Law § 70. According to Alison D., she and Virginia M. established a relationship, began living together, and decided to have a child whom Virginia M. would conceive through artificial insemination. They agreed to share all parenting responsibilities, and continued to do so for the first two years of the child's life. When the child was about 2½ years old, however, the parties ended their relationship and Alison D. moved out of the family home. The parties adhered to a visitation schedule for a time, but Virginia M. at first restricted and eventually stopped Alison D.'s contact with the child.

When the case reached us, we rejected Alison D.'s argument that she "acted as a *'de facto' parent* or that she should be viewed as a *parent 'by estoppel'* " (*Alison D.*, 77 NY2d at 656 [emphasis added]). As we explained,

"[t]raditionally, in this State it is the child's mother and father who, assuming fitness, have the right to the care and custody of their child, even in situations where the nonparent has exercised some control over the child with the parents' consent . . . To allow the courts to award visitation—a limited form of custody—to a third

person would necessarily impair the parents' right to custody and control" (*id.* at 656-657).

Because Alison D. "concede[d] that [Virginia M. was] a fit parent," she had "no right to petition the court to displace the choice made by the fit parent in deciding what is in the child's best interests" (*id.* at 657).

Citing Domestic Relations Law §§ 71 and 72 (permitting siblings and grandparents respectively to petition for visitation), we emphasized that "[w]here the Legislature deemed it appropriate, it gave other categories of persons standing to seek visitation and it gave the courts the power to determine whether an award of visitation would be in the child's best interests" (*id.*). Thus, we refused to "read the term parent in section 70 to include categories of nonparents who have developed a relationship with a child or who have had prior relationships with a child's parents and who wish to continue visitation with the child" (*id.*).

In support of our decision in *Alison D.*, we cited *Matter of Bennett v Jeffreys* (40 NY2d 543 [1976]) and *Matter of Ronald FF. v Cindy GG.* (70 NY2d 141 [1987]), cases which set forth bedrock principles of family law. In *Bennett*, we held that the State "may not deprive a parent of the custody of a child absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances" (40 NY2d at 544). Where extraordinary circumstances are present, the court determines custody based on the child's best interest. Concomitantly, in *Ronald FF.*, we held that "[v]isitation rights may not be granted on the authority of the . . . *Bennett* . . . extraordinary circumstances rule, to a biological stranger where the child, born out of wedlock, is properly in the custody of his mother" (70 NY2d at 142); and further noted that the mother possessed a fundamental right "to choose those with whom her child associates," which the State may not "interfere with . . . unless it shows some compelling State purpose which furthers the child's best interests" (*id.* at 144-145).

In *Matter of Jacob* (86 NY2d 651 [1995]), decided four years after *Alison D.*, we construed section 110 of the Domestic Relations Law, New York's adoption statute, to permit "the unmarried partner of a child's biological mother, *whether heterosexual or homosexual*, who is raising the child together with the biological parent, [to] become the child's second parent by means of adoption" (*id.* at 656 [emphasis added]). We stressed that permitting such second-parent adoptions "allows . . . children

to achieve a measure of permanency with both parent figures and avoids the sort of disruptive visitation battle we faced in [*Alison D.*]" (*id.* at 659).[2]

Although Debra H. argues otherwise, we did not implicitly depart from *Alison D.* in *Shondel J.*, where there were affirmed findings of fact that Mark D. had held himself out as the child's biological father, and had treated her as his daughter for the first 4¹/₂ years of her life. When Shondel J. sought orders of filiation and support, Mark D. requested DNA testing. The Family Court hearing examiner ordered genetic marker tests, which revealed that Mark D. was not, in fact, the child's biological father. As we pointed out, *Shondel J.* was an unusual case because "the process was inverted": "The procedure contemplated by [sections 418 (a) and 532 (a) of the Family Court Act] is that Family Court should consider paternity by estoppel *before* it decides whether to test for biological paternity" (7 NY3d at 330 [emphasis added]; *see* Family Ct Act § 418 [a] [governing paternity where there is a marriage] and § 532 [a] [governing paternity where there is no marriage], which both specify that "[n]o [genetic marker or DNA] tests shall be ordered . . . upon a written finding by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel, or the presumption of legitimacy of a child born to a married woman").

We held in *Shondel J.* that "a man who has mistakenly represented himself as a child's father may be estopped from denying paternity, and made to pay child support, when the child justifiably relied on the man's representation of paternity, to the child's detriment" (7 NY3d at 324). We premised our decision on "our precedents, the affirmed findings of fact and the legislative recognition of paternity by estoppel" (*id.* at 326). On the latter point, we highlighted that although paternity by estoppel for purposes of child support "originated in case law," it was "now secured by statute in New York"; namely, sections 418 (a) and 532 (a) of the Family Court Act (*id.* at 327).

We did not mention *Alison D.* in *Shondel J.* Nor did we intend to signal disaffection with *Alison D.* by citing *Jean Maby H.*, one of a handful of lower court decisions applying equitable estoppel to custody and visitation proceedings despite *Alison D.*, where

---

2.  While Judge Ciparick criticizes *Alison D.* for taking an "unwarranted hard line stance, fixing biology above all else as the key to determining parentage" (*see* Ciparick, J., concurring op at 607), our subsequent decision in *Jacob* softened any such "hard line" by permitting second-parent adoption.

we considered and explicitly rejected this approach (see *Alison D.*, 77 NY2d at 656). Specifically, after noting that "New York courts have long applied the doctrine of estoppel in *paternity and support proceedings* [because of] the best interests of the child" (*Shondel J.*, 7 NY3d at 326), we cited *Jean Maby H.* The pinpoint citation was made to a page where the Appellate Division similarly observed that courts have recognized equitable estoppel "as a defense in various proceedings involving *challenges to paternity*, including cases where there is evidence that the person seeking to avoid estoppel is not a biological parent" (*see Jean Maby H.*, 246 AD2d at 285 [citations omitted and emphasis added]), and that "[t]he paramount concern in applying equitable estoppel in *these cases* has been, and continues to be, the best interests of the child" (*id.* [emphasis added]).

Our holding in *Shondel J.* was limited to the context in which that case arose—the procedure for determining the paternity of an "alleged father." Moreover, we see no inconsistency in applying equitable estoppel to determine filiation for purposes of support, but not to create standing when visitation and custody are sought. As already noted, the Legislature has drawn the distinction for us: sections 418 (a) and 532 (a) of the Family Court Act direct the courts to take equitable estoppel into account before ordering paternity testing, while section 70 of the Domestic Relations Law does not even mention equitable estoppel. The procedure dictated by sections 418 (a) and 532 (a) is intended to prevent someone who has held himself out as a child's biological father from later evading the financial obligations of paternity by means of a scientific litmus test, thereby endangering the child's economic security or even rendering the child a ward of the State. This may on occasion result in deeming a biological relationship to exist where the putative father is, in fact, a biological stranger to the child, as turned out to be the case in *Shondel J.* (*see Shondel J.*, 7 NY3d at 331 [Cautioning that "a man who harbors doubts about his biological paternity has a choice to make. He may either put the doubts aside and initiate a parental relationship with the child, or insist on a scientific test of paternity *before* initiating a parental relationship"]). Debra H. would have us upend this rationale by allowing someone who is a *known* biological stranger to a child assert a parental relationship over the objections of the child's biological parent. *Shondel J.* is consistent with *Alison D.*'s core holding that parentage under New York law derives from biology or adoption.

In sum, *Alison D.*, in conjunction with second-parent adoption, creates a bright-line rule that promotes certainty in the wake of domestic breakups otherwise fraught with the risk of

"disruptive . . . battle[s]" (*Jacob*, 86 NY2d at 659) over parentage as a prelude to further potential combat over custody and visitation. While Debra H. and various amici in this case complain that *Alison D.* is formulaic, or too rigid, or out of step with the times, we remain convinced that the predictability of parental identity fostered by *Alison D.* benefits children and the adults in their lives. All four departments of the Appellate Division have consistently followed *Alison D.* (*see e.g. Anonymous v Anonymous*, 20 AD3d 333 [1st Dept 2005], *appeal dismissed* 6 NY3d 740 [2005]; *Bank v White*, 40 AD3d 790 [2d Dept 2007], *lv dismissed* 9 NY3d 1002 [2007]; *Gulbin v Moss-Gulbin*, 45 AD3d 1230 [3d Dept 2007], *lv denied* 10 NY3d 705 [2008]; *Matter of Lynda A.H. v Diane T.O.*, 243 AD2d 24 [4th Dept 1998], *lv denied* 92 NY2d 811 [1998]).

Despite this evidence to the contrary, Debra H. also protests that *Alison D.* has spawned doubt and confusion in the law in the 19 years since it was handed down. To cure this ostensible ill, though, Debra H. asks us to replace the bright-line rule in *Alison D.* with a complicated and nonobjective test for determining so-called functional or de facto parentage[3] at an equitable-estoppel hearing to be conducted by the trial court after

---

**3.** At oral argument, Debra H. advocated for the standard established by the Wisconsin Supreme Court in *In re Custody of H.S.H.-K.* (193 Wis 2d 649, 533 NW2d 419 [1995]). After first concluding that Wisconsin's visitation statute was not the exclusive means of obtaining court-ordered visitation and therefore did not preclude an exercise of its equitable powers, the Wisconsin Supreme Court, "mindful of preserving a biological or adoptive parent's constitutionally protected interests and the best interest of a child," decided that a trial court may "determine whether visitation is in a child's best interest if the petitioner *first proves* that he or she has *a parent-like relationship* with the child and that *a significant triggering event* justifies state intervention in the child's relationship with a biological or adoptive parent" (193 Wis 2d at 658, 533 NW2d at 421 [emphases added]). The court further determined that "[t]o meet these two requirements, the petitioner must prove the component elements of each one" (193 Wis 2d at 658, 533 NW2d at 421).
Specifically,

> "[t]o demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner

discovery and fact-intensive inquiry in the individual case. These equitable-estoppel hearings—which would be followed by a second, best-interest hearing in the event functional or de facto parentage is demonstrated to the trial court's satisfaction—are likely often to be contentious, costly, and lengthy. Here, for instance, the two sides collectively submitted affidavits to Supreme Court from at least 60 individuals, any or all of whom might be expected to testify at the equitable-estoppel hearing.

More to the point, the flexible type of rule championed by Debra H. threatens to trap single biological and adoptive parents and their children in a limbo of doubt. These parents could not possibly know for sure when another adult's level of involvement in family life might reach the tipping point and jeopardize their right to bring up their children without the unwanted participation of a third party.[4] Significantly, "the interest of parents in the care, custody, and control of their children[ ] is perhaps the oldest of the fundamental liberty interests recognized by" the United States Supreme Court (*Troxel v Granville*, 530 US 57, 65 [2000]). Courts must be sensible of "the traditional presumption that a fit parent will act in the best interest of his or her child" and protect the parent's "fundamental constitutional right to make decisions concerning the rearing of" that child (*id.* at 69-70). In our view, this fundamental right entitles biological and adoptive parents to refuse to allow a second-parent adoption, as Janice R. did, even if they have

---

has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature" (193 Wis 2d at 658-659, 533 NW2d at 421).
The contribution to a child's support (the third element) need not be monetary. Finally,
"[t]o establish a significant triggering event justifying state intervention in the child's relationship with a biological or adoptive parent, the petitioner must prove that this parent has interfered substantially with the petitioner's parent-like relationship with the child, and that petitioner sought court ordered visitation within a reasonable time after the parent's interference" (193 Wis 2d at 659, 533 NW2d at 421).
4. Judge Ciparick counters that the biological or adoptive parent may simply withhold "consent[ ] to the formation of [a] parental relationship between the [third party] and the child" (*see* Ciparick, J., concurring op at 609). This is no answer since the parent cannot predict the inherently unpredictable—i.e., how a judge might someday rule on the question of whether or when there had been sufficient "consent" such that, as a consequence, a "parental relationship" had been "formed." And erecting a Chinese wall to isolate the child from those adults who play a significant role in the parent's life is probably not practical, and is certainly not desirable for either the child or the parent.

permitted or encouraged another adult to become a virtual parent of the child, as Debra H. insists was the case here.

Next, we agree with Janice R. that any change in the meaning of "parent" under our law should come by way of legislative enactment rather than judicial revamping of precedent. Many states have adopted statutes expanding standing so that individuals who are not legal parents or blood relatives of a child may seek visitation and/or custody. Indiana, for example, authorizes a court to award custody to a "de facto custodian," defined as

> "a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least:
>
> "(1) six (6) months if the child is less than three (3) years of age; or
>
> "(2) one (1) year if the child is at least three (3) years of age" (*see* Ind Code Ann §§ 31-17-2-8.5, 31-9-2-35.5).

Several other states, including Colorado, Texas and Minnesota, likewise incorporate a temporal element in their third-party standing statutes, which contributes to predictability (*see e.g.* Colo Rev Stat Ann § 14-10-123 [1] [c] [person "other than a parent" may file a petition seeking allocation of parental responsibilities for the child if the person "has had the physical care of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical care"]; Tex Fam Code Ann § 102.003 [a] [9] ["An original suit may be filed at any time by . . . a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition"]; Minn Stat Ann § 257C.08 [4] ["If an unmarried minor has resided in a household with a person, other than a foster parent, for two years or more and no longer resides with the person, the person may petition the district court for an order granting the person reasonable visitation rights to the child during the child's minority"]; *see also* DC Code Ann § 16-831.01 [1]; Or Rev Stat Ann § 109.119 [1]; Wyo Stat Ann § 20-7-102 [a]).

Before granting custody to a nonparent over the parent's objection, a court in California must "make a finding that granting custody to a parent would be detrimental to the child and that granting custody to the nonparent is required to serve the

best interest of the child" (Cal Fam Code § 3041 [a]). "Detriment to the child" is defined to include "the harm of removal from a stable placement . . . with a person who has assumed, on a day-to-day basis, the role of [the child's] parent, fulfilling both the child's physical needs and . . . psychological needs for care and affection, and who has assumed that role for a substantial period of time" (*id.* § 3041 [c]). Notably, "[a] finding of detriment does not require any finding of unfitness of the parents" (*id.*). When making custody determinations in Virginia, the court must "give primary consideration to the best interests of the child . . . [and] assure minor children of frequent and continuing contact with both parents, when appropriate" (Va Code Ann § 20-124.2 [B]). In addition, while "[t]he court shall give due regard to the primacy of the parent-child relationship," it "may upon a showing by clear and convincing evidence that the best interest of the child would be served thereby award custody or visitation to any other person with a legitimate interest" (*id.*).

As this brief discussion of how some other states have tackled the standing issue shows, different policies and approaches have been implemented legislatively throughout the nation. Debra H. would have us preempt our Legislature by sidestepping section 70 of the Domestic Relations Law as presently drafted and interpreted in *Alison D.* to create an additional category of parent—a functional or de facto parent—through the exercise of our common-law and equitable powers. But the Legislature is the branch of government tasked with assessing whether section 70 still fulfills the needs of New Yorkers. The Legislature may conduct hearings and solicit comments from interested parties, evaluate the voluminous social science research in this area cited by Debra H. and the amici, weigh the consequences of various proposals, and make the tradeoffs needed to fashion the rules that best serve the population of our state.

In conclusion, *Alison D.*, coupled with the right of second-parent adoption secured by *Jacob*, furnishes the biological and adoptive parents of children—and, importantly, those children themselves—with a simple and understandable rule by which to guide their relationships and order their lives. For the reasons set out in this opinion, we decline Debra H.'s invitation to distinguish or overrule *Alison D.* Whether to expand the standing to seek visitation and/or custody beyond what sections 70, 71 and 72 of the Domestic Relations Law currently encompass remains a subject for the Legislature's consideration.

## II.

Our reaffirmation of *Alison D.* does not dispose of this case, however. Debra H. and Janice R. entered into a civil union in Vermont before M.R.'s birth. This circumstance presents two issues for us to decide: whether Debra H. is M.R.'s parent under Vermont law and, in the event that she is, whether as a matter of comity she is his parent under New York law as well, thereby conferring standing for her to seek visitation and custody in a best-interest hearing.

Vermont's civil union statute provides that parties to a civil union shall have "all the same benefits, protections and responsibilities under law . . . as are granted to spouses in a marriage" (Vt Stat Ann, tit 15, § 1204 [a]); and that they shall enjoy the same rights "with respect to a child of whom either becomes the natural parent during the term of the civil union," as "those of a married couple" (Vt Stat Ann, tit 15, § 1204 [f]). In *Miller-Jenkins*, the Vermont Supreme Court relied upon these provisions to hold that a child born by artificial insemination to one partner of a civil union should be deemed the other partner's child under Vermont law for purposes of determining custodial rights following the civil union's dissolution (*Miller-Jenkins*, 180 Vt at 464-465, 912 A2d at 969-970). The court concluded that in the context of marriage, a child born by artificial insemination was deemed the child of the husband even absent a biological connection. In light of section 1204 and by parity of reasoning, the court decided that the same result pertained to the partner in the civil union with no biological connection to the child.

Janice R. counters that in *Miller-Jenkins* the child was conceived by artificial insemination after the parties entered into their civil union, while M.R. was conceived before her civil union with Debra H. We see no reason why the Vermont Supreme Court would reach a different result about parentage based on this distinction. The court repeatedly emphasized how important it was that the child was *born* during the civil union (180 Vt at 465, 912 A2d at 970 ["Many factors are present here that support a conclusion that (the partner with no biological connection to the child) is a parent, including, first and foremost, that (she and the child's biological mother) were in a valid legal union at the time of the child's birth"]; 180 Vt at 466, 912 A2d at 971 ["Because so many factors are present in this case that allow us to hold that the nonbiologically-related partner is the child's parent, we need not address which factors

may be dispositive on the issue . . . We do note that, in accordance with common law, the couple's legal union at the time of the child's birth is extremely persuasive evidence of joint parentage"]). Indeed, entering into the civil union at a time when both partners know that one of them is pregnant by artificial insemination might well be viewed as presenting an even stronger case than *Miller-Jenkins* to support the nonbiological partner's parentage. There is certainly no potential for misunderstanding, ignorance or deceit under such circumstance.

Janice R. does not challenge the civil union's validity. She protests, though, that it was "of utterly no consequence" to her, and that while she "gave into" Debra H.'s "demand[s]," she did not enter into the civil union "blindly." Rather, Janice R.—who is a practicing attorney—professes to have conducted research and to have "found that [entering into a Vermont civil union] was of no legal significance in the State of New York, which is still the case today." Moreover, she claims to have "conferred with an attorney to make certain that a 'civil union' was of no legal consequence," and to have been "assured that it was not." Finally, she avers that "[k]nowing that the civil union was of no legal consequence in New York and did not confer . . . any additional rights and responsibilities, combined with [her] desire to put an end to [Debra H.'s] nagging, [she] acquiesced to the civil union."

In fact, the potential legal ramifications in New York of entering into a civil union in Vermont were uncertain in 2003,[5] and remain unsettled except to the extent we resolve the specific issue—i.e., parentage—presented by this case. Whatever her motivation or expectation, Janice R. chose to travel to Vermont to enter into a civil union with Debra H. In light of the *Miller-Jenkins* decision, we conclude that Debra H. is M.R.'s parent under Vermont law as a result of that choice. The question then becomes whether New York courts should accord comity to

5.  The first Supreme Court decision to consider the consequences in New York of a Vermont civil union was issued in April 2003—several months before Debra H. and Janice R. entered into their civil union—and was widely publicized. Although reversed by the Appellate Division in 2005, the trial court concluded that the surviving partner of a civil union validly contracted in Vermont was entitled to recognition as a "spouse" under New York's wrongful death statute and therefore had standing to recover for the wrongful death of his partner in the civil union (*see Langan v St. Vincent's Hosp. of N.Y.*, 196 Misc 2d 440 [Sup Ct, Nassau County 2003], *revd* 25 AD3d 90 [2d Dept 2005], *appeal dismissed based on lack of finality* 6 NY3d 890 [2006]).

Vermont and recognize Debra H. as M.R.'s parent under New York law as well.

The doctrine of comity

> "does not of its own force compel a particular course of action. Rather, it is an expression of one State's entirely voluntary decision to defer to the policy of another. Such a decision may be perceived as promoting uniformity of decision, as encouraging harmony among participants in a system of cooperative federalism, or as merely an expression of hope for reciprocal advantage in some future case in which the interests of the forum are more critical" (*Ehrlich-Bober & Co. v University of Houston*, 49 NY2d 574, 580 [1980] [citation omitted]).

New York's "determination of whether effect is to be given foreign legislation is made by comparing it to our own public policy; and our policy prevails in case of conflict" (*id.*). The court locates the public policy of the state in "the law as expressed in statute and judicial decision" and also considers "the prevailing attitudes of the community" (*id.*). Even in the case of a conflict, however, New York's public policy may yield "in the face of a strong assertion of interest by the other jurisdiction" (*id.*).

New York will accord comity to recognize parentage created by an adoption in a foreign nation (*see Matter of Doe*, 14 NY3d 100, 107-108 [2010] [comity may be extended to a Cambodian adoption certificate so that an individual who is a child's father under Cambodian law is also his father under New York law]). We see no reason to withhold equivalent recognition where someone is a parent under a sister state's law. Janice R., as was her right as M.R.'s biological parent, did not agree to let Debra H. adopt M.R. But the availability of second-parent adoption to New Yorkers of the same sex negates any suggestion that recognition of parentage based on a Vermont civil union would conflict with our State's public policy. Nor would comity undermine the certainty that *Alison D.* promises biological and adoptive parents and their children: whether there has been a civil union in Vermont is as determinable as whether there has been a second-parent adoption. And both civil union and adoption require the biological or adoptive parent's legal consent, as opposed to the indeterminate implied consent featured in the various tests proposed to establish de facto or

functional parentage.[6] In sum, our decision does not lead to protracted litigation over standing and is consistent with New York's public policy by affording predictability to parents and children alike.

Although she sought more expansive rulings, Debra H. also made the narrower case on this appeal that "comity should be accorded to the civil union at least to recognize [her] as a parent to M.R.," and that "[a]cknowledging the significance to M.R. of his parents' Vermont civil union *does not require resolving* whether New York grants comity to the civil union for other purposes" (emphasis added) (*see e.g. Godfrey v Spano*, 13 NY3d 358 [2009] [deciding taxpayer challenges on grounds not implicating New York's common-law marriage recognition rule]). We agree for the reasons given, and thus in this case decide only that New York will recognize parentage created by a civil union in Vermont. Our determination that Debra H. is M.R.'s parent allows her to seek visitation and custody at a best-interest hearing. There, she will have to establish facts demonstrating a relationship with M.R. that warrants an award in her favor.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for a best-interest hearing in accordance with this opinion.

GRAFFEO, J. (concurring). I concur with Judge Read's analysis as well as the result she reaches but write separately to explain why I believe our decision in *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) must be reaffirmed. There, we held that the term "parent" in Domestic Relations Law § 70 encompasses a biological or adoptive parent, i.e., only a person with a legally-recognized parental relationship to the child. We noted that a child's parent has a constitutionally protected right to determine with whom the child may associate. Under New York law, a legal parent's right to make such determinations "may not be displaced absent grievous cause or necessity" (*Alison D.*, 77

---

6. Vermont, like New York, does not provide by statute or case law for functional or de facto parentage (*see Titchenal v Dexter*, 166 Vt 373, 385, 693 A2d 682, 689 [1997] [Vermont Supreme Court concluded that lesbian companion of adoptive mother has no right to parent-child contact as equitable or de facto parent, noting that "(g)iven the complex social and practical ramifications of expanding the classes of persons entitled to assert parental rights by seeking custody or visitation, the Legislature is better equipped to deal with the problem" of third parties claiming a parent-like relationship and seeking court-compelled contact with a child]).

NY2d at 656; *see Matter of Ronald FF. v Cindy GG.*, 70 NY2d 141, 144 [1987]; *Matter of Bennett v Jeffreys*, 40 NY2d 543, 546 [1976]). A similar right has been recognized under the Federal Constitution (*see Troxel v Granville*, 530 US 57 [2000]). The Legislature authorizes parents to bring proceedings to ensure the proper care and custody of their children and has permitted a limited class of other persons—siblings and grandparents—standing to seek visitation in specified circumstances (*see* Domestic Relations Law §§ 71, 72; *Matter of E.S. v P.D.*, 8 NY3d 150 [2007]). Rather than employing an "equitable estoppel" or "in loco parentis" basis for establishing parental status, *Alison D.* created a bright-line rule that made it possible for biological and adoptive parents to clearly understand in what circumstances a third party could obtain status as a parent and have standing to seek visitation or custody with a child. For 19 years the rule articulated in *Alison D.* has provided certainty and predictability to New York parents and their children.

The *Alison D.* decision was criticized by some because it was unclear at that time whether a same-sex partner that was not biologically related to a child could become a legal parent through second-parent adoption. Any concern in that regard was resolved four years later in *Matter of Jacob* (86 NY2d 651 [1995]) where we held that the adoption statutes permit second-parent adoption by the unmarried partner of a child's biological parent. Thus, the law in New York is clear: a person who lacks a biological relationship to a child and desires to become a legal parent must undertake a second-parent adoption. Parents—whether in heterosexual or same-sex relationships, whether married or unmarried—have been able to order their lives accordingly. This rule has avoided confusion, particularly in the event a relationship is dissolved years later, as to whether the party lacking biological or legal ties to the child (i.e., who failed to pursue an adoption) would have standing to petition for custody or visitation.

As Judge Read points out, our decision in *Matter of Shondel J. v Mark D.* (7 NY3d 320 [2006]) applying equitable principles in the context of a paternity dispute was fully consistent with *Alison D.* Beyond the fact that the Legislature has incorporated an equitable standard in the Family Court Act provisions governing paternity determinations (*see* Family Ct Act § 418 [a]; § 532 [a]), Shondel J.—the biological mother in that case—did not object to a finding that Mark D. was the father of the child. To the contrary, Shondel J. initiated a proceeding expressly seeking to have Mark D. adjudicated the father for purposes of

obtaining financial support. Thus, the constitutional right of a fit parent to determine with whom her child associates was not implicated in *Shondel J.*, nor were equitable principles relied on in that case to declare a person lacking biological or adoptive ties to a child to be a parent over the objection of the child's fit biological mother. Consistent with the relevant statute, and with the consent of the biological mother, equitable estoppel was merely used as a vehicle to preclude Mark D. from withdrawing his prior sworn and unsworn statements that he was the child's father and from relying on genetic marker or DNA tests to disprove paternity.

*Shondel J.* did not undermine *Alison D.* and the objective standard for determining parental status emanating from that case continues to serve the interests of both parents and children. *Alison D.*'s clear standard encourages a party who seeks to form a parental relationship with a child but lacks biological ties to pursue a legal adoption as soon as possible, without leaving a question as important as parental status undetermined perhaps for years, subject to the credibility battles that characterize equitable estoppel hearings held long after the relationships between the parties have soured. By encouraging early adoptions, the *Alison D.* rule serves the best interests of New York's children as it is optimal to expeditiously establish legal parenthood, especially to protect a child against unforeseen events such as the death of a biological parent. And since the express written consent of the biological parent is a condition precedent to a second-parent adoption, the rule also guarantees that standing to seek visitation or custody will never hinge on an after-the-fact dispute as to whether the other party's relationship with the child was sufficiently close or had been fostered by the biological parent. Under *Alison D.*, when a romantic relationship ends, whether the parties were same-sex or heterosexual partners, a hearing to determine who is the child's legal parent is generally unnecessary as the parentage issue can readily be determined as a matter of law based on objective genetic proof or documentary evidence. Thus, protracted litigation on the standing of a party hoping to obtain custodial rights or visitation is avoided, which further promotes the settlement of these issues rather than the contentious litigation that is all too frequently harmful to children.

Judge Smith proposes a standard that addresses the parental status of certain same-sex partners that employ artificial insemination to conceive a child. He proposes that "where a child is

conceived through ADI [artificial donor insemination] by one member of a same-sex couple living together, with the knowledge and consent of the other, the child is as a matter of law—at least in the absence of extraordinary circumstances—the child of both" (see Smith, J., concurring op at 612). Like the equitable estoppel test, this formulation invites litigation over whether the parties were "living together" (presumably, they must be living together in a romantic relationship, not merely as roommates) at the time of insemination, whether the insemination was "with the knowledge and consent" of the other partner, and whether "extraordinary circumstances" exist, whatever those might be. Under this set of factors, the same types of factual controversies that typify the equitable estoppel analysis would ensue.[1]

I do not suggest that a specialized approach should not be developed for same-sex couples who conceive children through artificial insemination or other assisted reproduction technologies (ART), particularly as medical techniques continue to evolve. But the criteria for establishing parental rights should be objective to ensure certainty for the parties and consistency in application. For these reasons, I believe it is more appropriate for the Legislature to develop the standards and procedures under which parenthood will be determined for same-sex couples in the artificial insemination and ART context, just as it has done for married couples under Domestic Relations Law § 73 (providing that any child born to a married woman through artificial insemination is the child of her husband if he gave prior written consent to the procedure).

---

1. Although *Matter of H.M. v E.T.* (14 NY3d 521 [2010] [decided today]) does not involve an application for custody or visitation, the allegations in that case demonstrate some of the issues that arise in this context. There, 12 years after a same-sex relationship ended, the biological mother of a child born during the relationship through artificial insemination sought child support from her former same-sex partner and the same-sex partner denied that she was a parent of the child. The former partner alleged that, although she and the biological mother were living in the same household during the relevant period, this was not the product of a romantic relationship—she and her husband had hired the biological mother as a live-in nanny to their children and the mother had remained in the home in that capacity after the marriage ended. The former partner asserted that she had assisted the biological mother with the process of insemination because they were close friends; although they had been involved in a brief romantic relationship at that time, she denied that she had ever agreed to become a parent to the child. Obviously, under Judge Smith's approach, these disputes as to the parties' living and relationship status more than a decade ago, as well as whether they consented to parent the child together, would be the subject of a hearing.

Indeed, some states have enacted statutes that specifically address the parental rights of same-sex partners who rely on artificial insemination or ART to conceive a child. For example, the New Mexico Legislature adopted a provision stating that "[a] person who provides eggs, sperm or embryos for or consents to assisted reproduction . . . with the intent to be the parent of a child is a parent of the resulting child" (NM Stat Ann § 40-11A-703). The statute contemplates that the "intended parent or parents shall consent to the assisted reproduction in a record signed by them before the placement of the eggs, sperm or embryos" (NM Stat Ann § 40-11A-704[A]). The New York Legislature could craft a provision addressing the parental status of same-sex partners in the artificial insemination or ART context either by incorporating an objective standard that promotes predictability for parents and children, or by pursuing a different approach. But, to date it has not done so, nor has it legislatively overruled *Alison D.* I therefore conclude that there is no basis for this Court to depart from the analysis applied in that case and emphasize that, at present, the surest way for same-sex couples to protect the interests of children born during their relationships is to promptly undertake second-parent adoptions that constitute conclusive proof of parental status.

Although parental status for visitation and custody depends on a biological or adoptive relationship under New York law, Judge Read aptly demonstrates why it is appropriate in this case to consider Vermont law. Here, unable to marry or enter into a civil union in New York, the parties chose to enter into a civil union in Vermont when Janice R. was eight months' pregnant. At that time, as is the case today, the Vermont civil union statute clearly stated that "[t]he rights of parties to a civil union, with respect to a child of whom either becomes the natural parent during the term of the civil union, shall be the same as those of a married couple, with respect to a child of whom either spouse becomes the natural parent during the marriage" (Vt Stat Ann, tit 15, § 1204 [f]). Under Vermont's statute, a child born by artificial insemination to one partner of a civil union becomes the child of the other partner, meaning that this nonbiological parent has automatic standing to seek custody or visitation if there is a breakdown in the adult relationship (*see Miller-Jenkins v Miller-Jenkins*, 180 Vt 441, 912 A2d 951 [2006], *cert denied* 550 US 918 [2007]). The parties in this case are presumed to have understood the legal ramifications of their decision to enter into a civil union and one of

those legal ramifications was that each partner would be a parent of any child born during the union.[2] A legal, parental relationship was therefore created between Debra H. and the child.

Of course, the doctrine of comity would be inapplicable if the parentage provision in Vermont's civil union statute was inconsistent with New York public policy. But, in this regard, our sister-state's law—like New York's—predicates parentage on objective evidence of a formal legal relationship—the civil union. Since Debra H.'s status as a parent under Vermont law does not turn on the application of amorphous equitable standards but depends on the fact that she and Janice R. entered into a civil union before the child was born, it does not run afoul of the policy underlying *Alison D.* as it does not undermine New York's interest in ensuring certainty for parents and children.

CIPARICK, J. (concurring). Although I agree with the majority that principles of comity require the recognition of Debra H.'s parentage of M.R. because of the Vermont civil union between the parties, I write separately to set forth my view that *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991] should be overruled as outmoded and unworkable.

In *Alison D.*, the dissent predicted that the impact of the decision would be felt "far beyond th[e] particular controversy" of that case, by a "wide spectrum of relationships," including "heterosexual stepparents, 'common-law' and nonheterosexual partners . . . and even participants in scientific reproduction procedures" (77 NY2d at 657 [Kaye, J., dissenting]). That prediction has been borne out. In countless cases across the state, the lower courts, constrained by the harsh rule of *Alison D.*, have been forced to either permanently sever strongly formed bonds between children and adults with whom they have parental relationships (*see e.g. Matter of Janis C. v Christine T.*, 294 AD2d 496, 496-497 [2d Dept 2002], *lv denied* 99 NY2d 504 [2002]; *Gulbin v Moss-Gulbin*, 45 AD3d 1230, 1231 [3d Dept 2007]) or engage in deft legal maneuvering to explain away the apparent applicability of *Alison D.* (*see e.g. Jean Maby H. v Joseph H.*, 246 AD2d 282, 283, 288-289 [2d Dept 1998]; *Beth R. v Donna M.*, 19 Misc 3d 724, 734 [Sup Ct, NY County 2008]).

---

2. Another child was born to Janice R. after the parties' relationship ended but during the course of the civil union (which apparently has not been dissolved). Having failed to promptly attempt to establish a relationship with the second child and petition for custody or visitation, I believe that Debra H. has likely forfeited any right she may have had to assert parental rights.

Moreover, the decision in *Alison D.* has been both questioned by judges (*see e.g. Anonymous v Anonymous*, 20 AD3d 333, 333-334 [1st Dept 2005, Ellerin and Sweeny, JJ., concurring]) and roundly criticized by legal scholars (*see e.g.* Schepard, Law and Children, *Revisiting 'Alison D.': Child Visitation Rights for Domestic Partners*, NYLJ, June 27, 2002, at 3, col 1; Ettelbrick, *Who is a Parent?: The Need to Develop a Lesbian Conscious Family Law*, 10 NYL Sch J Hum Rts 513, 516-517, 522-532 [1993]).

To be sure, we are not in the practice of casting aside good legal precedent based merely on harsh results and scholarly criticism. *Alison D.*, however, has never been good legal precedent. Rather, the majority in that case took an unwarranted hard line stance, fixing biology above all else as the key to determining parentage and thereby foreclosing any examination of a child's best interests (*see* 77 NY2d at 657-658 [Kaye, J., dissenting]). As the dissent explained, the majority in *Alison D.* rendered an opinion that fell "hardest on the children of [nontraditional] relationships, limiting their opportunity to maintain bonds that may be crucial to their development. The majority[ ] retreat[ed] from the courts' proper role . . . [by] tightening . . . rules that should . . . , above all, retain the capacity to take the children's interests into account" (*id.* at 658).

Since *Alison D.*, our decisions and the decisions of many of the lower courts have properly focused on the best interests of the children when determining questions of parentage, including the application of equitable estoppel to determine paternity and support obligations (*see e.g. Matter of Shondel J. v Mark D.*, 7 NY3d 320, 324 [2006]). The majority here insists that it was appropriate to apply the doctrine of equitable estoppel in *Shondel J.* and consider the child's best interests, but to apply the doctrine here would be inappropriate. The majority sees no "inconsistency in applying equitable estoppel to determine filiation for purposes of support, but not to create standing when visitation and custody are sought" (majority op at 593) because section 70 of the Domestic Relations Law makes no mention of equitable estoppel. The majority infers that economic considerations are present in paternity and child support proceedings but not custody and visitation proceedings (*see id.*). I disagree. Support obligations flow from parental rights; the duty to support and the rights of parentage go hand in hand and it is nonsensical to treat the two things as severable. Moreover, while it is true that

section 70 of the Domestic Relations Law makes no mention of equitable estoppel, it is also true that the statute does not specifically define the term "parent." Notably, as Judge Kaye observed in the *Alison D.* dissent, one thing the Legislature *did* include in the statute was its intention that the courts "shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness" (Domestic Relations Law § 70 [a]; *see also Alison D.*, 77 NY2d at 659).

Other state courts have developed better, more flexible, multi-factored approaches to determine whether a parental relationship exists, thus conferring upon a petitioner standing to seek custody or visitation. Rather than relying strictly on biology or an adoptive relationship, as *Alison D.* does, other tests focus on a functional examination of the relationship between the parties and the child. For example, the approach developed by the Wisconsin Supreme Court is, in my opinion, properly protective of both the best interests of the children and the rights of biological and adoptive parents. Under the Wisconsin test,

> "[t]o demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature" (*In re Custody of H.S.H.-K.*, 193 Wis 2d 649, 658-659, 533 NW2d 419, 421 [1995]).

In short, I believe that, in order to demonstrate the existence of a parental relationship sufficient to confer standing under Domestic Relations Law § 70, a petitioner unrelated to a child by biology or adoption must prove that (1) the biological or adoptive parent consented to and encouraged the formation of a parental relationship; and (2) the petitioner intended to and actually did assume the typical obligations and roles associated with parenting (*see* Forman, *Same-Sex Partners: Strangers, Third Parties, or Parents? The Changing Legal Landscape and*

*the Struggle for Parental Equality*, 40 Fam LQ 23, 49 [2006]; Ettelbrick, *Who is a Parent?*, 10 NYL Sch J Hum Rts at 516-517; Storrow, *Parenthood by Pure Intention: Assisted Reproduction and the Functional Approach to Parentage*, 53 Hastings LJ 597, 640 [2002]; *see also In re Custody of H.S.H.-K.*, 193 Wis 2d at 658, 533 NW2d at 421; *V.C. v M.J.B.*, 163 NJ 200, 225, 748 A2d 539, 553 [2000] [discussing formation of parental relationship as relevant to determination of parentage]), as is alleged here.

Although the majority believes that a functional approach would "trap" single biological and adoptive parents "in a limbo of doubt" (majority op at 595), I strongly disagree. In a test such as Wisconsin's, for example, one element that must be proven is that the biological or adoptive parent consented to the formation of a parental relationship between the petitioner and the child. If a biological or adoptive parent does not consent, he or she may elect to continue raising the child on his or her own, without interference, as is a parent's constitutional right (*see Troxel v Granville*, 530 US 57, 65 [2000]).

The majority claims that adopting a functional approach would "sidestep[ ]" section 70 of the Domestic Relations Law and "preempt our Legislature" by "creat[ing] an additional category of parent" (majority op at 597). However, as noted above, section 70 of the Domestic Relations Law contains no definition of the term "parent." In my view, it was the majority in *Alison D.* that "sidestepped" section 70 by refusing to give appropriate weight to the clear legislative intent, expressed in the statute, to protect the "best interest[s]" and "welfare and happiness" of children.

Thus, taking into consideration the social changes that have occurred since *Alison D.* (*see Godfrey v Spano*, 13 NY3d 358, 380-381 [2009, Ciparick, J., concurring]; *see also Matter of Jacob*, 86 NY2d 651 [1995]) and recognizing that Supreme Court has inherent equity powers and authority pursuant to Domestic Relations Law § 70 to determine who is a parent and what will serve a child's best interests,* I would reverse on both grounds and hold that Debra H. has standing to proceed with a hearing on the merits of her petition.

---

* I agree with Judge Smith's concurrence insofar as he suggests that the presumption of legitimacy could be used to ascertain whether the same-sex partner of a biological parent is also a parent to a child born during the course of the parties' relationship, but would extend the presumption to include biological children of same-sex male couples as well. I believe that such a

SMITH, J. (concurring in *Debra H. v Janice R.* and *Matter of H.M. v E.T.*). These two cases present (though neither majority decision ultimately turns on) the question of whether a person other than a biological or adoptive mother or father may be a "parent" under New York law. In *Debra H. v Janice R.*, a visitation case, a majority of the Court reaffirms the holding in *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]) that New York parenthood requires a biological or adoptive relationship, though the majority also holds—correctly in my view—that we should recognize Debra H.'s parental status under the law of Vermont. In *Matter of H.M. v E.T.* (14 NY3d 521 [2010] [decided today]), a child support case, the majority holds—again correctly in my view—that Family Court has jurisdiction of the case, and does not reach the *Alison D.* question, while the dissent suggests that *Alison D.* requires dismissal.

Though I concur with the result in both cases, and join the *H.M. v E.T.* majority opinion in full, I would depart from *Alison D.*, both for visitation and child support purposes. I grant that there is much to be said for reaffirming *Alison D.*, but I conclude that there is even more to be said against it.

I begin by expressing wholehearted agreement with much of what the *Debra H.* majority opinion, and Judge Graffeo's concurring opinion, say. It is indeed highly desirable to have "a bright-line rule that promotes certainty in the wake of domestic breakups," and to avoid litigation "over parentage as a prelude to further potential combat over custody and visitation" (majority op at 593, 594). There are few areas of the law where certainty is more important than in the rules governing who a child's parents are. For that reason, I join the *Debra H.* majority in rejecting the approach taken by the *Alison D.* dissent, which favored a multi-factor test for parenthood "that protects all relevant interests" (77 NY2d at 662), and by the Wisconsin Supreme Court's decision in *In re Custody of H.S.H.-K.* (193 Wis 2d 649, 658-659, 533 NW2d 419, 421 [1995]), which permitted a party to establish a "parent-like relationship" by proving four amorphous elements, including such things as "significant responsibility for the child's care, education and development" and "a bonded, dependent relationship" with the child. The *Debra H.* majority is quite right to see in these vague formulas a recipe for endless litigation, which would mean endless misery for children and adults alike.

---

presumption, however, would constitute only one facet of a functional approach such as the one I suggest.

These reasons lead the *Debra H.* majority and the *H.M. v E.T.* dissent to follow *Alison D.* in concluding that women in the position of Debra H. (putting aside her civil union with Janice R.) and E.T. are not parents of their former lovers' children. But despite the high value I set on certainty and predictability, I find this result unacceptable. I would therefore adopt a different "bright-line rule"—one that includes these women and others similarly situated in the definition of "parent."

The position of Debra H. and E.T. is an increasingly common one. Each lived with her same-sex romantic partner. In each case, while the couple was living together, the partner was artificially inseminated with sperm from an unknown donor (artificial donor insemination, or ADI) and gave birth. Both women in each case expected, and led the other to expect, that both of them would be the child's parents. Yet the *Debra H.* majority holds that Debra H. would never have become a parent absent the civil union, while the *H.M. v E.T.* dissent implies that E.T. never became a parent at all. This approach not only disappoints the expectations of the adults involved: much worse, it leaves each child with only one parent, rendering the child, in effect, illegitimate.

To put a large and growing number of our state's children in that status seems wrong to me. Each of these couples made a commitment to bring a child into a two-parent family, and it is unfair to the children to let the commitment go unenforced. Nor can it be said that adoption by the nonbiological parent—an option available under *Matter of Jacob* (86 NY2d 651 [1995])—is an adequate recourse, for adoption is possible only by the voluntary act of the adopting parent, with the consent of the biological one. To apply the rule of *Alison D.* to children situated as are the children in these cases is to permit either member of the couple to make the child illegitimate by her whim—as the facts of these two cases illustrate.

I have said that the interest in certainty is extremely strong in this area; but society's interest in assuring, to the extent possible, that each child begins life with two parents is not less so. That policy underlies the common-law presumption of legitimacy, "one of the strongest and most persuasive known to the law" (*Matter of Findlay*, 253 NY 1, 7 [1930, Cardozo, Ch. J.]; *see also Michael H. v Gerald D.*, 491 US 110, 125 [1989] [the strength of the presumption derives from "an aversion to declaring children illegitimate . . . thereby depriving them of rights of inheritance and succession . . . and likely making them wards

of the state"]). The policy has been adopted as a matter of statute in particular circumstances (Domestic Relations Law §§ 24, 73) and, in one persuasively reasoned Appellate Division case, has been adapted as a matter of common law to protect children born by ADI (*Laura WW. v Peter WW.*, 51 AD3d 211 [3d Dept 2008]). I would apply the common-law presumption to the facts of these cases, and would hold that where a child is conceived through ADI by one member of a same-sex couple living together, with the knowledge and consent of the other, the child is as a matter of law—at least in the absence of extraordinary circumstances—the child of both.

The rule I propose is clearly defined in at least one respect: It would apply only to same-sex couples—indeed, only to lesbian couples, because I would leave for another day the question of what rules govern male couples, for whom ADI is not possible. This limitation may give some pause, for it seems intuitively that all people, male and female, gay and straight, should be treated the same way. Yet it is an inescapable fact that gay and straight couples face different situations, both as a matter of law and as a matter of biology. By the choice of our Legislature, a choice we have held constitutionally permissible (*Hernandez v Robles*, 7 NY3d 338 [2006]), same-sex couples in New York have neither marriage nor domestic civil unions available to them. And, pending even more astounding technological developments than we have yet witnessed, it is not possible for both members of a same-sex couple to become biological parents of the same child. These differences seem to me to warrant different treatment. Indeed, different treatment already exists, for both a statute (Domestic Relations Law § 73) and the common law (*Laura WW.*, 51 AD3d at 217) give a measure of protection to the children of married opposite-sex couples who are conceived by ADI. The rule I propose would give the children of lesbian couples similar, though not identical, protection.

In one respect, the rule I have suggested would come closer to treating gay and straight couples alike than the more flexible rules advocated or adopted in many writings, including the *Alison D.* dissent, the Wisconsin decision in *In re Custody of H.S.H.-K.*, and Judge Ciparick's concurrence today in *Debra H.* Under these approaches, the same-sex partners of biological parents would have an opportunity to become quasi-parents— "de facto parents," parents-by-estoppel, or persons "in a parent-like relationship." As to women in the situation of Debra H. and E.T., I would drop all the hyphens and quotation marks, and call them simply parents.

For these reasons, I would hold that Debra H. is M.R.'s parent, and that E.T. is the parent of H.M.'s biological son. Therefore, in *Debra H. v Janice R.*, I would not find it necessary to reach the effect of the Vermont civil union (although, since the majority does reach it, I join in its resolution of that question); and I would hold that Family Court has jurisdiction in *H.M. v E.T.* not only on the narrow ground adopted by the majority, but also on the ground that E.T. is the child's parent and therefore "chargeable with the support of such child" within the meaning of Family Court Act § 413 (1) (a).

Judges GRAFFEO, PIGOTT and JONES concur with Judge READ; Judge GRAFFEO concurs in a separate concurring opinion in which Judge JONES also concurs; Judge CIPARICK concurs in result in another opinion in which Chief Judge LIPPMAN concurs; Judge SMITH concurs in result in another opinion.

Order reversed, with costs, and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.