Matter of Tomeka N.H. v Jesus R. (2020 NY Slip Op 02015)





Matter of Tomeka N.H. v Jesus R.


2020 NY Slip Op 02015


Decided on March 20, 2020


Appellate Division, Fourth Department


Centra, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 20, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., CARNI, CURRAN, TROUTMAN, AND WINSLOW, JJ.


1041 CAF 18-02251

[*1]IN THE MATTER OF TOMEKA N.H., PETITIONER-APPELLANT,
v
JESUS R. AND BRENDA S., RESPONDENTS-RESPONDENTS. MAUREEN N. POLEN, ESQ., ATTORNEY FOR THE CHILD, APPELLANT. 






NIXON PEABODY LLP, ROCHESTER (CHRISTOPHER D. THOMAS OF COUNSEL), AND THE LGBT BAR ASSOCIATION OF GREATER NEW YORK, NEW YORK CITY, FOR PETITIONER-APPELLANT.
MAUREEN N. POLEN, ROCHESTER, ATTORNEY FOR THE CHILD, APPELLANT PRO SE.
KAMAN BERLOVE MARAFIOTI JACOBSTEIN & GOLDMAN LLP, ROCHESTER (GARY MULDOON OF COUNSEL), FOR RESPONDENT-RESPONDENT JESUS R.
AMY E. SCHWARTZ-WALLACE, ROCHESTER, FOR EMPIRE JUSTICE CENTER, AND SHANNON P. MINTER, SAN FRANCISCO, CALIFORNIA, OF THE CALIFORNIA BAR, ADMITTED PRO HAC VICE, FOR NATIONAL CENTER FOR LESBIAN RIGHTS, AMICI CURIAE.


Centra
 Appeals from an order of the Family Court, Monroe County (Joan S. Kohout, J.), entered August 9, 2018 in a proceeding pursuant to Family Court Act article 6. The order dismissed "the petition and amended petition." 
It is hereby ORDERED that the order so appealed from is affirmed without costs.
Opinion by Centra, J.P.: The issue in this case is whether petitioner has standing to seek joint custody of, and visitation with, the subject child, which would result in a tri-custodial arrangement among respondents, who are the biological mother and the biological father of the child, and petitioner. We conclude that petitioner cannot establish standing under Domestic Relations Law § 70 (a) in such circumstances.
FACTS
Petitioner and respondent mother were in a relationship and became engaged in 2009, but they never married because, at that time, same-sex marriage was not recognized under New York law. Their romantic relationship ended amicably in early 2010, and petitioner moved out of their residence. That summer, the mother engaged in sexual relations with respondent father, resulting in her becoming pregnant with the child who is the subject of this proceeding. According to petitioner and the mother, the father wanted nothing to do with the child, so the mother asked petitioner to raise the child with her, and petitioner agreed. The father, on the other hand, testified that he was not certain whether he was the father of the unborn child, but he concededly did nothing to establish his status as the father. Petitioner moved back in with the mother in September 2010 and helped her prepare for the baby's arrival. Petitioner and the mother also became intimate once again. Petitioner was at the hospital when the baby was born. She helped cut the umbilical cord and helped choose the child's name, and the child was given a hyphenated last name that combined the last names of the mother and petitioner. Petitioner took on the role [*2]of a parent when she and the mother took the child home, but petitioner moved out of the mother's home in the spring of 2012 when their romantic relationship again ended. Nevertheless, petitioner continued to regularly care for the child at petitioner's home.
Meanwhile, the father saw the child once or twice during the first year and a half of her life. In June 2013, the mother filed a paternity petition against the father, and Family Court issued an order of filiation in December 2013. Since then, there have been orders of custody and visitation between the mother and the father entered upon consent, whereby the mother and the father have joint custody, the mother has primary residency of the child, and the father has visitation with the child. It is undisputed that, since 2014, the father has visited with the child. The most recent order of custody gives the mother and the father shared equal access with the child.
In March 2017, petitioner filed a petition seeking an order granting her visitation with the child and, in October 2017, she filed an amended petition seeking custody and visitation. Petitioner argued that the doctrine of equitable estoppel gave her standing to seek custody and visitation and that it was in the best interests of the child for her to have custody and visitation. Petitioner did not seek to sever the father's rights to the child. Instead, she sought "tri-custody." The mother supported the amended petition, while noting that she did not wish to terminate the father's rights. The Attorney for the Child (AFC) also supported the amended petition, noting that the child had a very strong relationship with petitioner and viewed her as a parent.
The father moved to dismiss the amended petition for lack of standing, and petitioner, the mother, and the AFC all opposed the motion. After holding a hearing on the issue of standing, the court granted the motion and dismissed the "petition and amended petition" (Matter of T.H. v J.R., 61 Misc 3d 775, 788 [Fam Ct, Monroe County 2018]). Petitioner and the AFC now appeal. We affirm, but for reasons different from those stated by the court.
Analysis and Discussion
I.
To obtain custody or visitation with a child, a party must establish standing; it is not enough to assert that such custody or visitation would be in the best interests of the child. The only ways to establish such standing are: (1) pursuant to Domestic Relations Law § 70 as a parent; (2) pursuant to Domestic Relations Law § 71 as a sibling; (3) pursuant to Domestic Relations Law § 72 as a grandparent; or (4) by showing extraordinary circumstances pursuant to Matter of Bennett v Jeffreys (40 NY2d 543, 549 [1976]). Petitioner is not a sibling or a grandparent, and she does not allege extraordinary circumstances; thus, only Domestic Relations Law § 70 is applicable here.
Domestic Relations Law § 70 (a) provides as follows:
"Where a minor child is residing within this state, either parent may apply to the supreme court for a writ of habeas corpus to have such minor child brought before such court; and on the return thereof, the court, on due consideration, may award the natural guardianship, charge and custody of such child to either parent for such time, under such regulations and restrictions, and with such provisions and directions, as the case may require, and may at any time thereafter vacate or modify such order. In all cases there shall be no prima facie right to the custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly" (emphasis added).
In Matter of Alison D. v Virginia M. (77 NY2d 651, 656-657 [1991]), the Court of Appeals held that a "parent" within the meaning of Domestic Relations Law § 70 (a) meant only a biological or adoptive parent. In 2016, however, the Court of Appeals overruled Alison D. and held that, "where a partner shows by clear and convincing evidence that the parties agreed to [*3]conceive a child and to raise the child together, the non-biological, non-adoptive partner has standing to seek visitation and custody under Domestic Relations Law § 70" (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 14 [2016]). The Court noted that the statute did not define "parent," leaving it to be defined by the courts (id. at 18), and that the Court's definition of that term in Alison D. was "needlessly narrow" (id. at 24). In each of the two cases before the Court in Brooke S.B., the petitioner alleged that "the parties [had] entered into a pre-conception agreement to conceive and raise a child as co-parents" (id. at 27). The Court held that those allegations, if proven by clear and convincing evidence, were sufficient for the petitioners to establish standing (see id.). The Court further held:
"Inasmuch as the conception test applies here, we do not opine on the proper test, if any, to be applied in situations in which a couple has not entered into a pre-conception agreement. We simply conclude that, where a petitioner proves by clear and convincing evidence that he or she has agreed with the biological parent of the child to conceive and raise the child as co-parents, the petitioner has presented sufficient evidence to achieve standing to seek custody and visitation of the child. Whether a partner without such an agreement can establish standing and, if so, what factors a petitioner must establish to achieve standing based on equitable estoppel are matters left for another day, upon a different record" (id. at 28).
Petitioner and the AFC argue that the facts of this case are a natural extension of the reasoning in Brooke S.B. They argue that, although there was no pre-conception agreement, there was a post-conception agreement for petitioner to raise the child as a parent. We conclude, however, that petitioner cannot establish standing because Domestic Relations Law § 70 (a) simply does not contemplate a court-ordered tri-custodial arrangement.
The wording of Domestic Relations Law § 70 (a) is clear and straightforward. It states that "either" parent may seek custody or visitation (id.). It is a well-settled principle of statutory construction that "[w]ords of ordinary import used in a statute are to be given their usual and commonly understood meaning" (McKinney's Cons Laws of NY, Book 1, Statutes § 232; see Rosner v Metropolitan Prop. & Liab. Ins. Co., 96 NY2d 475, 479-480 [2001]; Matter of Village of Chestnut Ridge v Howard, 92 NY2d 718, 723 [1999]). The common dictionary definition of "either" when used as an adjective has two senses, i.e., "being the one and the other of two" and "being the one or the other of two" (Merriam-Webster Online Dictionary, either [https://www.merriam-webster.com/dictionary/either] [emphasis added]). In addition, when the Court of Appeals stated in Brooke S.B. that section 70 does not define the critical term "parent," it added the following in a footnote: "We note that by the use of the term either,' the plain language of Domestic Relations Law § 70 clearly limits a child to two parents, and no more than two, at any given time" (Brooke S.B., 28 NY3d at 18 n 3). In our view, the clear wording of section 70 (a), which was expressly recognized by the Court of Appeals, precludes any relief to petitioner here because there are already two parents: the mother and the father. Under section 70 (a), there simply can be no more. We are therefore in agreement with the Third Department's recent decision determining that to allow three parents to "simultaneously have standing to seek custody . . . does not comport with the holding in Matter of Brooke S.B." (Matter of Shanna O. v James P., 176 AD3d 1334, 1335 [3d Dept 2019]).
The AFC contends that we should not address the issue whether Domestic Relations Law § 70 (a) allows more than two parents to have standing because the father raised that contention for the first time on appeal. The father's contention, however, presents an issue of law appearing on the face of the record that could not have been " obviated or cured by factual showings or legal countersteps' in the trial court" (Oram v Capone, 206 AD2d 839, 840 [4th Dept 1994]). Although the AFC contends that petitioner could have taken legal countersteps such as seeking standing by showing extraordinary circumstances under Bennett, the petition and amended petition did not make any allegations to show standing under that theory. There were thus no legal countersteps that petitioner could have taken to defeat the father's motion to dismiss this amended petition for lack of standing.
II.
We respectfully disagree with our dissenting colleague that "tri-custodial arrangements are a logical and necessary evolution" of the principles set forth in Brooke S.B. First, the Court was not faced with a third party seeking to establish custody and/or visitation when there were already two legally recognized parents, and the Court in fact emphasized that it is important to "protect the substantial and fundamental right of biological or adoptive parents to control the upbringing of their children" (Brooke S.B., 28 NY3d at 26). That is a particularly relevant concern here, where the father opposes petitioner's amended petition seeking custody and visitation. During the hearing, the father testified that he was not aware that petitioner was caring for the child for long periods of time.
Second, the dissent's reliance on Brooke S.B. is misplaced inasmuch as nothing in the Court's decision signaled that it would ever countenance a tri-custodial arrangement, and in fact the decision shows the opposite. As noted, the Court highlighted that Domestic Relations Law § 70 was limited to two parents (Brooke S.B., 28 NY3d at 18 n 3). In the language we quoted from the decision earlier, the Court stated that a petitioner may establish standing where he or she proved that he or she "agreed with the biological parent of the child to conceive and raise the child as co-parents" (id. at 28 [emphasis added]). The Court did not say biological parents, and its use of the term co-parents means just two. Even in the quote relied upon by the dissent, the Court was again considering just two parents when it stated that it was not then deciding "whether, in a case where a biological or adoptive parent consented to the creation of a parent-like relationship between his or her partner and child after conception, the partner can establish standing to seek visitation and custody" (id. [emphasis added]). The dissent improperly expands that language to suggest that standing would be established if two parents consented to the creation of a parent-child relationship between one parent's partner and the child.
Third, the dissent's reliance on Brooke S.B. to support a tri-custodial arrangement is misplaced because, as explained earlier, the Court was interpreting the term "parent," which was not defined in the statute (28 NY3d at 18). It was the absence of the definition of that "critical term" (id.) in Domestic Relations Law § 70 that allowed the Court in Brooke S.B. to expand the "needlessly narrow" (id. at 24) definition it had given to that term in Alison D. The statute, however, explicitly uses the term "either" as a modifier of "parent" (§ 70 [a]), which the dissent glosses over as not in harmony with the "spirit and purpose" of section 70. "[T]he plain language of [a] statute provides the best evidence of legislative intent" (Kimmel v State of New York, 29 NY3d 386, 397 [2017]). The dissent makes no attempt to suggest that the legislature ever intended that a tri-custodial arrangement would be permissible under section 70. We agree with the father that a tri-custodial arrangement raises a host of issues, including child support, that are best left addressed by the legislature.
The dissent's reliance on two Appellate Division cases to support a tri-custodial arrangement is also unpersuasive. In Matter of Jaylanisa M.A. (Christopher A.) (157 AD3d 497, 498 [1st Dept 2018]), the issue was whether the appellant, the purported father of the child, established standing to seek visitation or custody. The appellant never filed a paternity petition or an acknowledgment of paternity (id.). The First Department held that the appellant did not prove by clear and convincing evidence that he and the mother "agreed to conceive and raise the child together, or that the mother consented to the post-conception creation of a parent-like relationship between appellant and the child" (id.). Thus, the issue of the appellant's standing involved consideration of whether there was an agreement between the parent and her partner, not between two parents and one parent's partner. In Matter of Frank G. v Renee P.-F. (142 AD3d 928, 929 [2d Dept 2016], lv dismissed 28 NY3d 1050 [2016]), the mother agreed to be a surrogate for her brother and his domestic partner. After the brother and his partner separated, the brother petitioned for custody of the twin children, which his partner opposed (id. at 929-930). The Second Department held that the brother established by clear and convincing evidence that he and his partner entered into a pre-conception agreement to conceive the children and raise them together as parents, which gave him standing pursuant to Brooke S.B. (id. at 930-931). That was the only issue before the court. The court stated that the mother had also filed for custody of the children, but there was nothing further mentioned regarding that petition (id. at 929-931). It is therefore unclear whether that case would have ended up with a tri-custodial arrangement.
III.
Petitioner and the AFC contend that the father should be estopped from challenging the amended petition. "The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted" (Matter of Shondel J. v Mark D., 7 NY3d 320, 326 [2006]). "Equitable estoppel requires careful scrutiny of the child's relationship with the relevant adult and is ultimately based upon the best interest[s] of the child" (Matter of K.G. v C.H., 163 AD3d 67, 82 [1st Dept 2018]; see Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 6 [2010]; Matter of Chimienti v Perperis, 171 AD3d 1047, 1049 [2d Dept 2019], lv denied 33 NY3d 912, 913 [2019]). While we agree with petitioner and the AFC that an equitable estoppel argument is a logical extension of Brooke S.B., the doctrine must be considered within the confines of Domestic Relations Law § 70 (see generally K.G., 163 AD3d at 79), and section 70 (a) does not allow a tri-custodial arrangement.
Petitioner's reliance on two recent cases invoking equitable estoppel when there were three parties is misplaced. Both cases involved same-sex married couples and sperm donors, where the sperm donors agreed with the couples that the sperm donors would not seek custody or visitation of any child born from the artificial insemination procedure, but after a child was born they brought petitions seeking to establish paternity and also seeking either custody or visitation (Matter of Christopher YY. v Jessica ZZ., 159 AD3d 18, 20-21 [3d Dept 2018], lv denied 31 NY3d 909 [2018]; Matter of Joseph O. v Danielle B., 158 AD3d 767, 767-768 [2d Dept 2018]). Both the Third Department and the Second Department held in those cases that the sperm donors were equitably estopped from asserting paternity rights and dismissed the relevant petitions (Christopher YY., 159 AD3d at 28-34; Joseph O., 158 AD3d at 771-772). Thus, there remained only two parents of the child in each case, not three. Neither petitioner nor the mother in this case raised an equitable estoppel argument to prevent the father from being adjudicated the father of the child or to prevent him from seeking custody and visitation. In fact, it was the mother who commenced the paternity proceeding against the father and, once he was determined to be the father of the child, he sought custody and visitation, and the mother consented to the custody and visitation orders.
IV.
The dissent details the positive relationship between petitioner and the child and concludes that petitioner has become "the most stable parent the child has known." We note, however, that there was conflicting testimony regarding the extent of each party's relationship with the child. But even if we agreed with the dissent's characterization, petitioner's situation is neither novel nor unique. For example, stepparents often form close parental bonds with their stepchildren, and sometimes a stepparent may become the most important parental figure a child has. Yet if a stepparent and a biological parent separate, the unfortunate result sometimes is the severing of that relationship between the stepparent and the stepchild if the biological parents are unwilling for that relationship to continue. There is no indication that has been the case here inasmuch as the mother continues to allow petitioner to see the child during the mother's parenting time.
The dissent also states that a tri-custodial agreement is the only result that would protect "the fundamental liberty interest the child has in preserving her family-like bonds." In so stating, the dissent essentially ignores "perhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court, i.e., "the interest of parents in the care, custody, and control of their children" (Troxel v Granville, 530 US 57, 65 [2000]). When the Court of Appeals expanded the definition of "parent" in Brooke S.B., it was careful to both recognize and protect that interest (28 NY3d at 26). It stated that "the fundamental nature of those rights mandates caution in expanding the definition of th[e] term [parent] and makes the element of consent of the biological or adoptive parent critical" (id. at 26). Here, the father has never consented to petitioner being a parent to his child.
V.
We accordingly affirm the order on the ground that petitioner does not have standing to seek custody of, or visitation with, the child.
Carni and Troutman, JJ., concur with Centra, J.P.; Curran, J., concurs in the [*4]following opinion: I concur entirely with the majority's statutory analysis and conclusions. I write separately to highlight what I perceive to be a critical underpinning of my dissenting colleague's rationale. As I understand it, the dissent partly relies on "the fundamental liberty interest the child has in preserving her family-like bonds" in concluding that petitioner has standing to seek joint custody of the child. The dissent also relies on respondent mother's efforts to encourage and foster "a parent-child relationship between petitioner and the child since before the child was born and throughout the child's life."
I respectfully disagree with the dissent's supposition that either the United States Supreme Court or the New York Court of Appeals has held that a child has a "fundamental liberty interest . . . in preserving [his or] her family-like bonds." I further disagree that any such liberty interest possessed by the child may be lawfully elevated to such a height that it could outweigh a parent's rights, like in the circumstances presented by this case.
I respectfully submit that the dissent's analysis mixes up the requirement that the courts consider the child's best interests—an analysis only embarked upon once standing first has been established—with the existence of a separate fundamental liberty interest purportedly endowed upon the child. In my view, that would cause us to enter dangerous and uncharted territory. Instead, because petitioner relied on her own rights to establish standing to seek joint custody, not the liberty interest of the child, I respectfully submit that the dissent's central reliance on the child's purported liberty interest is misplaced.
Winslow, J., dissents and votes to reverse in accordance with the following opinion: I respectfully dissent. I would reverse the order, deny the motion, reinstate the amended petition, and remit the matter to Family Court for a hearing on custody and visitation.
By concluding that petitioner lacks standing to seek joint custody of, or visitation with, the subject child notwithstanding that petitioner has parented that child for more than seven years, we defeat the spirit and purpose of Domestic Relations Law § 70. The majority's interpretation of the term "either" in the statute as necessarily prohibiting the child from having more than two parents at one time contravenes the rationale espoused by the Court of Appeals in Matter of Brooke S.B. v Elizabeth A.C.C. (28 NY3d 1, 14 [2016]) and replicates the inequitable results caused by the rule established in Matter of Alison D. v Virginia M. (77 NY2d 651, 656-657 [1991]). Such an inequitable result is precisely what the Court sought to remedy. Domestic Relations Law § 70 must be read to effectuate the welfare and best interests of children, particularly those like the subject child who are raised in nontraditional families. By stripping petitioner of the right to fight for the ability to continue to be a parent to the child she has raised since birth, the determination of the majority not only fails to promote the welfare of the child, it works to the detriment of the child by severing the " strongly formed bonds between children and adults with whom they have parental relationships' " (Brooke S.B., 28 NY3d at 24, quoting Debra H. v Janice R., 14 NY3d 576, 606 [2010, Ciparick, J., concurring], rearg denied 15 NY3d 767 [2010], cert denied 562 US 1136 [2011]).
When respondent mother informed respondent father that she was pregnant with the child, the father declined to acknowledge his paternity and refused to accept responsibility for the child. The mother subsequently asked petitioner if she would be willing to raise the child with the mother because the father had made it clear that he did not want to be involved. The mother and petitioner thereafter entered into a post-conception agreement pursuant to which petitioner would be a parent to the child. Petitioner moved in with the mother and, together, they prepared for the arrival of the child. Among other things, petitioner attended the prenatal appointments with the mother and helped care for the mother throughout her pregnancy with the child. Petitioner read books and talked to the child while the child was in utero. She drove the mother to the hospital when the mother went into labor and was present in the delivery room when the child was born in February 2011. Petitioner cut the umbilical cord and held the child immediately after her birth, and petitioner and the mother named the child together. The child was given a hyphenated last name, which incorporated both the mother's and petitioner's last names.
In the days, weeks, months, and years following the child's birth, petitioner, although a non-biological and non-adoptive parent, established a parent-child relationship with the child and shared with the mother all the rights and responsibilities of parenthood. The child considers [*5]petitioner to be her parent, and petitioner considers the child to be her child. When the child was a newborn, petitioner and the mother shared the duties of caring for an infant, including daytime and nighttime feedings, diaper changes, clothing the child, bathing the child, and taking the child to her many doctor's appointments. In April 2012, petitioner moved out of the home that she shared with the mother, and the mother and petitioner entered into a co-parenting agreement, pursuant to which petitioner shared custody of the child with the mother. Petitioner never wavered in her commitment to parent the child, and the parent-child bond between petitioner and the child continued to flourish. Petitioner cared for the child's basic needs, attended parent-teacher conferences, transported the child to school and activities, helped the child with her homework, and served as an emergency contact for the child. Petitioner taught the child to ride a bike and to roller-skate, and enrolled the child in gymnastics lessons. The child spent most holidays with the mother, petitioner, and petitioner's family. Throughout the child's life, petitioner has remained a consistent, stable, loving, and capable parent.
The father did not have a relationship with the child during the first two years and nine months of her life. Although he was aware of the child's birth, the father did not attempt to establish a relationship with the child or seek a legal determination of his parentage, and he did not pay child support. In Family Court in 2013, the father denied that he was the child's father until a paternity test proved otherwise. An order of filiation was entered in December 2013, and the father began to exercise visitation with the child shortly before her third birthday. The child and the father eventually developed a relationship, and the mother, petitioner, and the father have each established parental bonds with the child. The child's nontraditional family unit grew with the addition of the father, and petitioner, the mother, and the Attorney for the Child are all in favor of a tri-custodial arrangement, which would allow petitioner, the mother, and the father to continue to grow their parental bonds with the child. The father, however, moved to dismiss petitioner's amended petition seeking custody and visitation with the child on the ground that petitioner lacked standing. In my view, the court erred in granting the father's motion.
In Brooke S.B., the Court of Appeals sought to correct the infliction of "disproportionate hardship on the growing number of nontraditional families across our state" (28 NY3d at 25), noting the trauma that children suffer as a result of separation from a primary attachment figure, such as a de facto parent (see id. at 25-26). The Court recognized the importance of protecting the substantial and fundamental right of biological parents to control the upbringing of their children but left unanswered the question "whether, in a case where a biological or adoptive parent consented to the creation of a parent-like relationship between his or her partner and child after conception, the partner can establish standing to seek visitation and custody" (id. at 28).
Here, the father effectively "consented to the post-conception creation of a parent-child relationship between [petitioner] and the child" (Matter of Jaylanisa M.A. [Christopher A.], 157 AD3d 497, 498 [1st Dept 2018]) when he abdicated the responsibility of parenting the child to the mother. The mother allowed, encouraged, and fostered the development of the parent-child relationship between petitioner and the child, and the father's decision not to be involved in the child's life until she was almost three years old paved the way for the child to develop a primary attachment to petitioner, who became the most stable parent the child has known. If the principles set forth in Brooke S.B. are to be followed, tri-custodial arrangements are a logical and necessary evolution (see Matter of Frank G. v Renee P.-F., 142 AD3d 928, 930-931 [2d Dept 2016], lv dismissed 28 NY3d 1050 [2016]; Matter of David S. v Samantha G., 59 Misc 3d 960, 965-966 [Fam Ct, NY County 2018]; Dawn M. v Michael M., 55 Misc 3d 865, 869-870 [Sup Ct, Suffolk County 2017]). I reject the position of the majority that Brooke S.B. dictates otherwise.
While the Court in Brooke S.B. recognized the substantial and fundamental right of biological or adoptive parents to control the upbringing of their children, the Court also acknowledged that children have fundamental liberty interests in preserving "intimate family-like bonds" and that children's interests must "inform the definition of parent' " (28 NY3d at 26). The Court specifically sought to overrule and repair the " permanent[ ] sever[ing of] strongly formed bonds between children and adults with whom they have parental relationships' " (id. at 24) and end the need for " deft legal maneuvering' " to reach a child's best interests and take into account principles of equity (id. at 26). Although the Court did not specifically reference a tri-custodial arrangement, it did identify nontraditional families as the very families it sought to protect (see id. at 25).
Contrary to the view of the majority, I have not ignored the fundamental liberty interests of parents to make decisions concerning the care, custody, and control of their children. I have simply considered that which the majority has ignored, i.e., the child's liberty interest in preserving her strong primary attachment to petitioner, which developed long before the father became one of only "two legally recognized parents" in the child's life. If the law kept pace with the realities of families today, and if Brooke S.B. had been decided before the child was born, it is likely that petitioner would have established her parental relationship with the child during the years when the father desired no contact with the child and that the father would have been estopped from becoming the child's second parent.
The decision of the Supreme Court in Troxel v Granville (530 US 57 [2000]) is distinguishable and does not prevent petitioner from establishing standing here. In Troxel, grandparents who did not have parental relationships with the subject children sought visitation with the children after their only living parent limited the grandparents' visitation with them (id. at 60-61). The Court in Troxel ruled on the constitutionality of a state statute that, as applied, allowed a judge to disregard and overturn the parent's decision to limit the grandparents' visitation, while giving no special weight to the parent's decision, based solely on the judge's determination of the children's best interests (id. at 67-68). Unlike in Troxel, the mother of the child here has allowed, encouraged, and fostered the development of a parent-child relationship between petitioner and the child since before the child was born and throughout the child's life. Moreover, when petitioner and the child formed that parent-child relationship, the mother and petitioner were the only two parents in the child's life.
To legally sever the strongly formed bond between petitioner and the child based upon the definition of the term "either" perpetuates the "widespread harm to children predicted by Judge Kaye's dissent [in Alison D.]" (Brooke S.B., 28 NY3d at 22; see Alison D., 77 NY2d at 657-658 [Kaye, J., dissenting]) and noted by Judge Ciparick in her concurrence in Debra H. (14 NY3d at 606-607). The stated intent of Brooke S.B. was to stop narrowly defining "parent" as determined by biology, marriage, or adoption. The Court left the door open for consideration of other factual scenarios when it stated that the question whether a partner without a pre-conception agreement can establish standing would be "left for another day, upon a different record" (Brooke S.B., 28 NY3d at 28). The implication of the majority that the Court of Appeals would never countenance a tri-parent arrangement ignores the Court's focus to define "parent" in such a way that the best interests of the child could be reached in appropriate cases where principles of equity would take into consideration the social changes that have occurred in the last quarter century that have redefined family. In my view, to determine that the amended petition here does not warrant consideration on the merits is to sidestep the legislative intent of Domestic Relations Law § 70 to "protect the best interest[s]' and welfare and happiness' " of the child (Debra H., 14 NY3d at 609 [Ciparick, J., concurring]).
Although the Court in Brooke S.B. recognized in a footnote that the plain language of the term "either" limits a child to two parents, and no more than two, at any given time (28 NY3d at 18 n 3), that footnote is not part of the Court's holding in the case. The question of how the Court would decide a case such as this—where the petitioner seeks to maintain the strong attachment bond of a parent by today's definition, which was formed with the child before the father had any relationship with the child and before the father was recognized as a parent—remains unanswered.
The Third Department case Matter of Shanna O. v James P. (176 AD3d 1334 [3d Dept 2019]), cited by the majority, concerned a child whose father, after leaving the child's mother, obtained sole custody of the child and then raised the child with a woman he later married, i.e., the child's stepmother, for approximately eight and a half years (id. at 1334). When the father separated from the stepmother, he left the child in the stepmother's care and then informed the child's mother that he had done so. Approximately 10 months after learning that the child was no longer living with the father, the mother, who had seen the child only sporadically over the years, filed a petition for custody and, subsequently, the stepmother also filed a petition for custody (id. at 1334, 1337). Family Court awarded custody to the stepmother, with visitation to the mother and father. On appeal, the Third Department determined that the court erred in basing its custody determination on the premise that the stepmother was a de facto parent who had standing to seek custody under Domestic Relations Law § 70 (a) (id. at 1334-1335). Nevertheless, the Third Department determined that the stepmother established standing based [*6]on extraordinary circumstances inasmuch as the mother had very little contact with the child while the child was at a formative age and the child was raised largely by the stepmother (id. at 1337). The Third Department then conducted a best interests analysis and, upon determining, inter alia, that the stepmother had been the most consistent parental figure in the child's life and would maintain stability for the child, affirmed the award of custody to the stepmother (id. at 1337-1338). In my view, the Third Department erroneously concluded that a child cannot have three parents at once under Domestic Relations Law § 70 (a) and, by conducting a best interests analysis based upon its finding of extraordinary circumstances, the Third Department engaged in the type of " deft legal maneuvering' " that Brooke S.B. sought to end (Brooke S.B., 28 NY3d at 26).
The legislature could not have anticipated the many changes that would occur with respect to what constitutes an American family when Domestic Relations Law § 70 was enacted in 1909 or even when it was amended in 1964. Still, "one thing the [l]egislature did include in the statute was its intention that the courts shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness' " (Debra H., 14 NY3d at 608 [Ciparick, J., concurring], quoting Domestic Relations Law § 70 [a]; see also Alison D., 77 NY2d at 659 [Kaye, J., dissenting]). As the Court of Appeals noted in Brooke S.B., the term "either parent" was added in 1964 to expand the scope of the statute, which had previously limited standing in custody and visitation matters to "a legally separated, resident husband and wife' pair" (28 NY3d at 24). A key tenet of statutory interpretation is that "courts normally accord statutes their plain meaning, but will not blindly apply the words of a statute to arrive at an unreasonable or absurd result' " (People v Santi, 3 NY3d 234, 242 [2004], quoting Williams v Williams, 23 NY2d 592, 599 [1969]). As the Court of Appeals has noted, in the past, the legislature has made changes to conform section 70 to the courts' preexisting equitable practices (see Brooke S.B., 28 NY3d at 24, citing L 1964, ch 564, § 1; Mem of Joint Legis Comm on Matrimonial and Family Laws, Bill Jacket, L 1964, ch 564 at 6). Other courts have recognized families with more than two parents (see Frank G., 142 AD3d at 929-931),[FN1] and we should refuse to apply the statute so literally here.
The majority's reasons for denying petitioner standing to seek a tri-custodial arrangement are reminiscent of the reasons for which same-sex parents were denied standing in the past, but our response to the question before us now should recognize the realities of modern life and families of today. In Alison D., the Court's definition of the term "parent" did not include an adult who was unrelated to a child by biology or adoption (77 NY2d at 657). The Court's decision there severed the bond that had developed over the course of six years and had formed as a result of a joint decision between the petitioner, Alison D., and her partner, respondent Virginia M., to have and co-parent a child together, and share all parental responsibilities. The respondent's attorney argued that Alison D. was not a parent, and the Court referred to her as a third party and held that only the legislature could expand the definition of "parent" to change Alison D.'s status from a biological stranger to a parent (id. at 656-657). It took 25 years to put an end to the damage done to children in nontraditional families, and it is more than disconcerting that the majority's decision will result in a continuation of such damage. While the majority adopts the position that a tri-custodial arrangement would raise a host of issues, negotiating difficulties between parties is the daily business of the family courts, and the family courts are well suited to grapple with such issues. Under the circumstances presented here, no other result protects the fundamental liberty interest the child has in preserving her family-like bonds (see Brooke S.B., 28 NY3d at 26, citing Troxel, 530 US at 88-89 [Stevens, J., dissenting]). Thus, I conclude that petitioner has standing to seek custody and visitation.
Entered: March 20, 2020Mark W. Bennett
Clerk of the Court



Footnotes

Footnote 1: The majority misconstrues the reason this case is cited. It is not because the issue of standing there is identical to the issue here, but rather because the decision, which affirmed the underlying order of Family Court, Orange County, resulted in the subject children having more than two parents.